UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 12-10264-RGS

UNITED STATES OF AMERICA

v.

DANNY VELOZ et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO SUPPRESS

June 4, 2015

STEARNS, D.J.

The above-captioned case was transferred to this session of the court on November 4, 2014. Several motions to suppress are pending. The first three involve the identifications of defendants Danny Veloz, Jose Matos, and Gadiel Romero by cooperating witnesses.[1] In addition, Veloz objects to the search of his residence pursuant to a warrant issued by Magistrate Judge Marianne Bowler,[2] the subsequent search of hard drives and memory chips taken from computers and cell phones seized at his

---

[1] While designated as confidential by the government, at the hearing it became apparent that the actual identities of the informants are no secret to counsel involved in the case.

[2] Veloz also seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), claiming that the agent-affiant omitted material information regarding the informant's truthfulness in the warrant affidavit.

home, and to a later search of email accounts held in his name by Google and Apple.[3]   The court heard oral argument on the legal issues on May 13, 2015.   As there are no material facts in dispute, the court declines to hold an evidentiary hearing, and will instead address each motion on its merits.

BACKGROUND

The FBI and various local law enforcement agencies had undertaken a joint investigation of Joloperros (which roughly translates to "stick-up men") involved in violent kidnappings and home invasions in the Lawrence, Massachusetts area.   Joloperros "crews" frequently targeted local drug dealers.   The crews would surreptitiously attach global positioning system (GPS) units to their victims' vehicles, track their movements, and after a successful hostage-taking, demand ransom payments from the kidnap victims and their families.

On July 23, 2012, Lawrence police responded to a 9-1-1 call at 67 Allston Street, after Minerva Amparo reported having witnessed a white minivan follow her husband's car into their driveway.   Three men wearing masks and black T-shirts emblazoned with the word "Police" (and shouting "Police!") had held her husband Manuel Amparo and another man (Jose

---

[3] Romero has withdrawn a motion to suppress statements that he made to a jailhouse informant.

Castro) at gunpoint, forcing them into the van and driving away. Lawrence police and the FBI recovered a white zip tie (used as a handcuff) next to Manuel Amparo's car, as well as a small GPS device that had been attached to the rear side bumper of his car.

Early the following morning, Manchester, New Hampshire police responded to a 9-1-1 call at 859 Clay Street, after a homeowner reported that a man standing on his porch claimed to have been a kidnapping victim. Manuel Amparo, displaying visible injuries, had escaped from his captors and run for help. He told police that he had been kidnapped in Lawrence the day before by four masked men in a white Toyota minivan. He had been take to New Hamphire where he was punched, kicked, burned with an iron, and held for ransom.[4] He led police to 890 Clay Street, where Castro and three of the kidnappers were still on the premises. Officers arrested Henry Maldonado, Thomas Wallace, and Jose Guzman, and, after obtaining a search warrant for the house and the minivan, seized a handgun, police paraphernalia, a GPS device, and several heating irons. Police also discovered blood stains in the interior of the minivan.

After initially denying his involvement, one of the arrested men

---

[4] While a captive, Manuel Amparo was put on the phone with an individual later identified as Veloz who threatened to kill him if he did not arrange the payment of a ransom.

(identified as CW-2) begin cooperating with the government. On the evening of July 24, 2012, CW-2 gave a lengthy, recorded, post-*Miranda* statement in which he admitted to his role in the kidnapping. *See* Dkt. No. 309-9. CW-2 related that he met the members of the crew (Guzman, Wallace, Gadiel Romero also known as "TC," and Luis Reynoso) at the Veloz residence, and drove to Matos also known as "Boyca"'s apartment to gather firearms and police shirts. They then drove to Amparo's home in the white minivan. There, dressed in police regalia, they had abducted Amparo and Castro and taken them to New Hampshire. CW-2 named Veloz as the chief of the crew and described the location and interior layout of his home. CW-2 explained that Veloz tracked the movements of his potential victims (mostly drug dealers referred to Veloz by other drug dealers who paid him for protection) by attaching GPS units to their cars. CW-2 stated that he had personally observed Veloz monitoring the movements of his victims on a laptop computer attached to a large-screen television and a cellular phone in his home.[5] In addition, CW-2 accurately described Veloz as light-skinned and in his 30's; that he had a black belt in

---

[5] In his grand jury testimony in August of 2012, CW-2 testified that Veloz recruited him for the kidnapping crew in the spring of 2012, and that he had met with the other crew members at Veloz's residence approximately three times to plan the July 23 kidnapping.

martial arts, numerous martial arts trophies in his apartment, and had once owned a karate shop in Lawrence; that he had spent a year in the Middleton Jail on gun charges; that he lived with his wife and two young children; and that he owned a beige/gold Cadillac CTS. CW-2 also noted that Veloz had a distinctive tattoo of a tiger face on his right arm.[6]

Prior to his initial appearance in Boston, CW-2 rode with agents to 443-447 Andover Street in Lawrence, where he identified Apartment #9 as Veloz's residence.[7] A Cadillac sedan and CW-2's personal car were parked on the street in front of Veloz's home. On the basis of CW-2's information, on July 25, 2012, FBI Special Agent John Orlando obtained and executed a search warrant at Veloz's apartment. The search recovered two laptops, a tablet computer, two thumb drives, and seven cellular phones.

On August 2, 2012, FBI Special Agent Kathryn Earle obtained a supplemental search warrant for the contents of the seized devices. On August 6 and 7, 2012, agents downloaded data from the thumb drives and

---

[6] CW-2 stated that Matos ("Boyca") stored the firearms and paraphernalia used in the kidnappings in his apartment and physically attached the GPS units to victims' cars.

[7] CW-2 also directed agents to 17-19 Tyler Street in Lawrence, where he indicated that Matos ("Boyca") lived on the second floor.

the cellular phones.[8]  On August 13, 2012, a forensic examiner searched and imaged the laptop computers.  Over the following months, agents analyzed the copied data and determined that one of the laptops was used in the kidnappings.  An email address contained in the laptop (palomo.1025@gmail.com)[9] listed to a Juan Pablo Durarte,[10] and a telephone number (978-876-2897),[11] were determined to have been used in connection with the purchase of a GPS unit.  The laptop also contained GPS satellite images of the streets in and around Amparo's home.

Also on August 2, 2012, CW-2 was shown a three-ring binder containing 37 photographs (without any identifying information) labeled 1-37.[12]  He accurately identified photograph 30 as that of Veloz.  During

---

[8] The Boston FBI office lacked the technical capacity to search the tablet computer, and sent it to an outside laboratory for forensic examination.

[9] In June and September of 2014, agents also executed search warrants addressed to Google and Apple for information associated with this and another email address discovered on Veloz's laptop.  Veloz seeks to suppress the fruits of these searches as well.

[10] The address associated with Juan Pablo Durarte is Matos's address at 17 Tyler Street in Lawrence.

[11] Veloz had also given this number as his home telephone when being booked by police.

[12] During or after the July 24 interview, CW-2 was shown a single

his grand jury testimony, he also accurately identified photos of Guzman (also known as "Cano"), Wallace, Reynoso, and Romero.   On August 31, CW-2 identified Matos from an array of 6 photos.

CW-3 also began to cooperate with law enforcement shortly after the July 23 kidnapping.   In August of 2012, he told the grand jury that he had met Maldonado at a methadone clinic in 2007 and had begun selling pills with him, supplied by Veloz, in or about January of 2012.   In the spring of 2012, Maldonado approached CW-3 about participating in a hostage-taking and introduced CW-3 to Guzman.   Maldonado and Guzman referred to Veloz as "Maestro" because of his role in orchestrating the kidnappings. CW-3 also testified about Veloz's use of GPS devices to track potential victims.   Prior to the July 23 kidnapping, CW-3 met with Veloz and other crew members at Veloz's apartment approximately five times.   CW-3 accurately described the exterior and interior of Veloz's residence, and related that Veloz had purchased a Cadillac with the proceeds of a prior successful kidnapping.   CW-3 also described meeting with Matos at the Veloz residence, that Matos's apartment served as the "stashhouse" for the operation, and described Matos physically.

---

Registry of Motor Vehicles photo, also without any identifying information, which CW-2 correctly identified as Veloz.   CW-2 was also shown a binder containing photographs 1-28, which did not include a photo of Veloz.

On July 30, 2012, CW-3 was shown a loose-leaf binder containing 36 numbered photographs without identifying information. He identified photograph 30 as Veloz. During his grand jury testimony, he accurately identified photographs of Guzman, Maldonado, and two photos of Veloz. On August 29, 2012, CW-3 also identified Matos from an array of 6 photos.

Like CW-2 and CW-3, CW-5 pled guilty to conspiracy to commit kidnapping and agreed to cooperate with the government. He told the grand jury in July of 2013 that he had met Veloz and Romero while they were inmates at the Middleton Jail in late 2010/early 2011. Veloz recruited CW-5 and Romero to join his kidnapping crew. Veloz had explained to CW-5 the use of GPS units to track potential ransom victims (usually drug dealers). CW-5 testified that he had either participated in or had knowledge of seven different kidnappings carried out by the Veloz crew. For example, CW-5 admitted to taking part in the kidnapping of a target named "Majimbe" with Veloz, Romero, and Matos. CW-5 had observed Matos put a GPS device on Majimbe's vehicle prior to the kidnapping, and participated in the remote tracking of Majimbe's car from Veloz's apartment. CW-5 met with other members of the crew on multiple occasions at Veloz's residence and accurately described its interior.

In November of 2012, CW-5 was shown individual photographs taken

from the binder kept by the FBI and accurately identified two photos of Veloz, as well as photos of Romero, Matos, Maldonado, Wallace, and Reynoso. During his grand jury testimony he identified photos of Veloz and Romero.

DISCUSSION

1. <u>Motions to suppress photographic (mugshot) identifications by cooperating witnesses of Veloz (#238 ), Matos (#270), and Romero (#276-1)</u>

Defendants argue that the conduct of the photographic identifications was deficient because: (1) the agents did not employ a double blind or blinded procedure; (2) the cooperating witnesses were not told that they were not required to make an identification; and (3) were not asked how certain or confident they were when they did make an identification. Veloz and Matos also contend that some of the arrays shown were of an unconstitutionally small size (arrays of 6 photos were shown to identify Matos, while CW-2 during his initial interview was shown a single photograph of Veloz).

While the policy arguments over best practices in conducting a photographic identification are of interest, they are of no constitutional import. The arguments are principally derived from dicta in a Supreme Judicial Court (SJC) decision, *Commonwealth v. Silva-Santiago*, 453 Mass.

782, 797 (2009) (while "[w]e have yet to conclude that an identification procedure is unnecessarily suggestive unless it is administered by a law enforcement officer who does not know the identity of the suspect (double-blind procedure), . . . we acknowledge that it is the better practice . . . ."). The SJC's further ruminations on the desirability of instructing a person being asked to view an array that the alleged wrongdoer may or may not be depicted, and asking her at time of the identification how certain she is, *id.* at 797-798, were adopted as recommended "best practices" by a Study Group appointed by the SJC to delve into the issue of misidentifications. *See* SJC Study Group of Eyewitness Evidence, Report and Recommendations to the Justices (July 23, 2013), at 89-90. While the SJC appears inclined to adopt most, if not all, of the recommendations of the Study Group,[13] this does not affect federal practice (although it may ultimately have persuasive appeal).

The use of photographs for identification purposes in federal investigations is governed by due process considerations of fairness. The

---

[13] The SJC has expressed skepticism regarding one of the recommendations (sequential viewing), *see Commonwealth v. Walker*, 460 Mass. 590, 602 (2011), and has repeatedly held that the failure to use techniques like blinded viewing, goes to the weight and not the admissibility of identification evidence. *See id.*

test to be applied is whether the methods used by police to elicit an identification were "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). It is generally held that an array of at least six photos (the suspect and five fillers) is acceptable,[14] although there is no *per se* rule barring the use of a single photo. *See Nasser v. Vinzant*, 519 F.2d 798, 801 (1st Cir. 1975); *compare United States v. Mears*, 614 F.2d 1175, 1177 (8th Cir. 1980) (improper to include defendant twice in an array of seven photos) *with United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994) ("[W]e believe that the number of photographs in an array is not itself a substantive factor, but instead is a factor that merely affects the weight given to other alleged problems or irregularities in an array.").

There is no reason, however, to belabor the issue – what distinguishes this case is the fact that each of the cooperating witnesses had prior familiarity with the person or persons they identified – indeed, they were literal "partners in crime." It is uniformly held by state and federal courts, that where a witness is shown to have had prior familiarity with a defendant, a due process hearing need not be held, as no amount of police suggestion is

---

[14] This also was the minimum number endorsed by the SJC Study Group. *See* Report and Recommendations to the Justices, at 89.

likely to have influenced the witness's identification. *See People v. Rodriquez*, 79 N.Y.2d 445, 450 (1992) (the "known to one another" exception); *Commonwealth v. Pressley*, 390 Mass. 617, 619 (1983) (a judge need not instruct on the possibility of good faith mistake where "the parties are so well known to each other or so closely related that . . . the identification by the victim is either true or the victim is lying."); *United States v. Henderson*, 320 F.3d 92, 101 (1st Cir. 2003) ("Nor need we dwell too long on Powers' identification of defendant. There was evidence from which it could be found that she had known Henderson going back to 1994."); *United States v. Drougas*, 748 F.2d 8, 27 (1st Cir. 1984), *holding modified on other grounds by United States v. Piper*, 35 F.3d 611 (1st Cir. 1994) ("As a fellow conspirator in the smuggle, the government witness certainly had the opportunity and incentive to accurately identify Ellis."); *see also Mears*, 614 F.2d at 1177 (despite improperly including two photos of defendant in the photo array, witness's in-court identification of defendant was reliable because of their prior mutual business dealings).[15]

2. <u>Motion to suppress search of electronic equipment by Veloz (#264)</u>

---

[15] Moreover, CW-2 accurately identified Veloz by his distinctive tattoo as well as his photo.

Veloz contends that after seizing his computer, cell phones, and thumb drives, the government did not complete the search of their contents until some 18 months later. [16]    He contends that the delay was constitutionally unreasonable, and that the government violated Fed. R. Crim. P. 41, which places a 14-day time limit on the return of a warrant. The latter argument is the easier to dispose of as the procedural requirements for the return of a warrant under Rule 41 are "basically ministerial," *United States v. Dauhpinee*, 538 F.2d 1, 3 (1st Cir. 1976), and absent any showing of prejudice, "do[] not provide grounds for the suppression of the evidence obtained pursuant to the warrant." *United States v. Gerald*, 5 F.3d 563, 567 (D.C. Cir. 1993).

With respect to the former argument, Veloz conflates the forensic examiner's search of a device – where data is copied for further review – with the review of the already seized data. *See United States v. Habershaw*, 2002 WL 33003434, at *8 (D. Mass. May 13, 2002) ("Further forensic analysis of the seized hard drive image does not constitute a second execution of the warrant or a failure to 'depart the premises' as defendant claims, any more than would a review of a file cabinet's worth of seized

---

[16]  The return of the search warrant was filed on March 12, 2014.

documents."). Although reports reflecting on-going analysis of the seized data were generated in March of 2014, there is no dispute that the government copied or attempted to copy the data from the devices almost immediately after their seizure. "The Fourth Amendment itself contains no requirements about *when* the search or seizure is to occur or the *duration*." *United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005) (internal quotation marks omitted). "A delay in execution of the warrant under Rule 41 does not render inadmissible evidence seized, absent a showing of prejudice to the defendants resulting from the delay. . . . Courts have permitted some delay in the execution of search warrants involving computers because of the complexity of the search." *Id.*

Given the impracticalities of conducting a forensic examination in a person's home or office, the creation of a mirror image of a suspect computer hard drive for later analysis has become a common and constitutionally permissible practice. *See United States v. Ganias*, 755 F.3d 125, 135-136 (2d Cir. 2014) (collecting cases). "[C]omputer searches are not, and cannot be subject to any rigid time limit because they may involve much more information than an ordinary document search, more preparation and a greater degree of care in their execution." *United States v. Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 66 (D. Conn. 2002).

Where problems have arisen is in instances in which the government fails to expeditiously return non-responsive information found on a seized or mirrored hard drive. *See Ganias,* 755 F.3d at 140-141 (suppression called for where government agents retained computer documents that were beyond the scope of the original warrant for almost two-and-a-half years). But, even in these instances, a rule of reasonableness applies. Where, as here, the government acted reasonably in seeking outside forensic expertise, and there is no allegation that wrongfully seized and later discovered material of an exculpatory nature was willfully retained, the on-going off-site analysis of the contents of Veloz's hard drives raises no Fourth Amendment or due process issue.

3. <u>Motion to suppress fruits of search and seizure and for a *Franks* hearing by Veloz (#208 and #225)</u>

(a) Veloz's contentions

Veloz contends that there was no probable cause to issue the warrant to search his home. He maintains that the information provided by CW-2 was not corroborated in any meaningful sense, that the evidence of a car belonging to an arrested coconspirator on a public street near his house was not material, that the agent's expertise regarding kidnapping techniques was not connected in any real sense to this case, and that the agents omitted

material information from the warrant affidavits, notably, that immediately after being arrested, CW-2 gave false information about his involvement in the crime.[17]

    (b)    Probable cause

Probable cause means "reasonable cause," something significantly less exacting than "more likely than not" or "by a preponderance of the evidence." *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979). Probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (*plurality opinion*) (internal citation omitted). In assessing probable cause, federal courts are to adhere to the flexible "totality of the circumstances" test of probable cause approved by the Supreme Court in *Illinois v. Gates*, 462 U.S. 213,

---

[17] The government for its part contends that there was probable cause because the confidential witness's information revealed highly detailed knowledge of illegal activities and was therefore self-authenticating, that the information was corroborated by other information such as the identification of other coconspirators, the identification of Veloz's home address, car, wife, and the description of the use of GPS units on victims' cars, and by the identification of a coconspirator's car parked in front of Veloz's home.

230-231 (1983) (stressing that probable cause is a fluid concept – "not readily, or even usefully, reduced to a neat set of legal rules"). Whether a warrant in fact issued on a showing of probable cause is a matter of law to be determined by the court. *Beck v. Ohio*, 379 U.S. 89, 96 (1964).

It has long been the rule that probable cause may be established solely through hearsay information provided by a confidential informant. In *Gates*, the Supreme Court rejected any "rigid" application of the "two-pronged" test of an informant's tip drawn from *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969). *Gates* involved an anonymous tip implicating a local couple in drug trafficking. The officer who prepared the warrant succeeded in corroborating a number of largely innocent details and in confirming predictions contained in the tip, but had no means of establishing the informant's identity and thus, the basis of his or her knowledge of the couple's criminal activity. Applying the *Aguilar-Spinelli* test, the Illinois Supreme Court found the affidavit wanting.

The Supreme Court reversed. Conceding that the *Aguilar* factors of "veracity," "reliability," and "basis of knowledge" are "highly relevant," the Court nonetheless rejected the notion that "these elements should be understood as entirely separate and independent requirements to be rigidly

exacted in every case." *Gates*, 462 U.S. at 230. The Court concluded that

> it is wiser to abandon the "two-pronged test" established by our decisions in *Aguilar* and *Spinelli*. In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. . . . The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Id.* at 238-239.

Although *Gates* suggests a likely finding of probable cause even were CW-2 an anonymous informant, that is simply not the case. Veloz's legal argument, which is based on the law governing anonymous tips, *see* Def.'s Br. at 7, founders on this point. CW-2, far from being anonymous, was not only known to police – he was in fact one of Veloz's coconspirators. In *United States v. Harris*, 403 U.S. 573 (1971), Chief Justice Burger, in discussing *Jones v. United States*, 362 U.S. 257 (1960), noted that "Jones never suggested that an averment of previous reliability was necessary," and held that an informant's admissions of his own criminal involvement – his "declarations against penal interest" – carried their own indicia of credibility. *Harris*, 403 U.S. at 581-582, 594. "People do not lightly admit

a crime and place critical evidence in the hands of the police in the form of their own admissions." *Id.* at 583; *see also United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir. 1996) ("The fact that an informant's statements are against his or her own penal interest adds credibility to the informant's report."); *United States v. Campa*, 234 F.3d 733, 738 (1st Cir. 2000) ("Bullon's own admission of complicity, and the risk of police retaliation for giving false information, added to the likelihood of his veracity." (internal citations omitted)).[18]

 (c) The *Franks* Issue

 While a judicial ruling on a motion to suppress is ordinarily confined to the "four corners" of the affidavit, there are circumstances in which a defendant may challenge the truthfulness of statements made by the affiant. *See Franks v. Delaware*, 438 U.S. 154 (1978); *cf. United States v. Southard*, 700 F.2d 1, 7 (1st Cir. 1983) (a facially sufficient affidavit is entitled to a presumption of validity). To be entitled to a *Franks* hearing, a defendant must make a "substantial preliminary showing" that an affidavit contains intentionally false or recklessly untrue statements that are material

---

[18] Here there is no dispute as to CW-2's "basis of knowledge" – he claimed to have seen first-hand what he reported. *See United States v. Del Toro Soto*, 676 F.2d 13, 19-20 (1st Cir. 1982) (informant watched defendants steal mail).

to a finding of probable cause.  *Franks*, 438 U.S. at 155-156, 170.

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Id.* at 171.  A showing of simple factual error or negligent omission is insufficient to trigger a *Franks* hearing.  *See United States v. Monaco*, 700 F.2d 577, 580 (10th Cir. 1983); *United States v. Baldwin*, 691 F.2d 718, 720 n.1 (5th Cir. 1982); *United States v. Tanguay*, 2015 WL 2445764, at *9 (1st Cir. May 22, 2015).

If a hearing is warranted, the defendant must prove the knowing falsity or recklessness of the affiant's statements by a preponderance of the evidence.  *Franks*, 438 U.S. at 156.  If the showing is made, the offending statement is excised from the affidavit, which is then reexamined for probable cause. *Id.* at 171-172; *United States v. Veillette*, 778 F.2d 899, 903-904 (1st Cir. 1985).

The reckless omission of material information from the affidavit also raises a *Franks* issue.  *See United States v. Rumney*, 867 F.2d 714, 720 (1st

Cir. 1989); *see also United States v. Hall*, 113 F.3d 157, 158 (9th Cir. 1997) (reckless omission of the "absolutely critical" fact that the informant had been previously convicted for falsely reporting a crime); *cf. United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) ("[A]n affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information.").

On the other hand, the omission of a fact that does not cast doubt on the existence of probable cause is not a material misrepresentation. *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980); *see also United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) (an omission must be made with the intent to mislead); *United States v. Moscatiello*, 771 F.2d 589, 603 (1st Cir. 1985), *vacated on other grounds sub. nom. Carter v. United States*, 476 U.S. 1138 (1986) (the omission of irrelevant facts is no basis for suppression); *United States v. Reivich*, 793 F.2d 957, 962-963 (8th Cir. 1986) (the failure to apprise the magistrate of the fact that informants had been promised leniency did not diminish the showing of probable cause); *United States v. Calisto*, 838 F.2d 711, 714-716 (3d Cir. 1988) (affiant's failure to disclose that certain information in the affidavit had been transmitted by fellow officers did not detract from the showing of

probable cause).  There may also be circumstances, although they would appear rare, in which the failure to include information not known to the affiant might give rise to a *Franks* violation.  *See Tanguay*, 2015 WL 2445764, at *8 (asking whether certain "red flags" about an informant's history of mental instability might have created "a duty of further inquiry"). Where there is a finding that the affiant intentionally or recklessly omitted material facts from the affidavit, the reviewing court should determine whether the omitted information, had it been included, would have defeated the finding of probable cause.  *United States v. Cole*, 807 F.2d 262, 267-268 (1st Cir. 1986).

The *Franks* hearing is limited to material impeaching the veracity and care of the affiant.  *Franks*, 438 U.S. at 171.  The credibility of a confidential informant or cooperating witness is tested by the rules set out in *Aguilar, Spinelli,* and *Gates*, and not by way of a *Franks* hearing.  *See United States v. Carmichael*, 489 F.2d 983, 989 (7th Cir. 1973); *In re Search Warrant Dated July 4, 1977*, 667 F.2d 117, 137 (D.C. Cir. 1981), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990). Stated differently, the issue is not whether a non-governmental informant gave false or misleading information, but whether the affiant fabricated the informant, misrepresented the informant's statements, or recklessly relied

on the informant's report. *See Lawmaster v. United States*, 993 F.2d 773, 775 (10th Cir. 1993); *cf. Illinois v. Rodriguez*, 497 U.S. 177, 185-186 (1990) ("[W]hat is generally demanded of the many factual determinations that must be regularly made by agents of the government . . . is not that they always be correct, but that they always be reasonable."); *compare People v. Lucente*, 506 N.E.2d 1269, 1277 (Ill. 1987) ("The greater the showing that the informant blatantly lied to the officer-affiant or that the information from the informant is substantially false, the greater is the likelihood that the information was not appropriately accepted by the affiant as truth and the greater the probability that the affiant in putting forth such information, exhibited a reckless disregard for the truth.").

Here, the only potentially material omission advanced by Veloz is the fact that CW-2, when first arrested, gave a self-exculpatory and false version of the facts, a version that he quickly recanted. An experienced Magistrate Judge would not be surprised to learn that a defendant-informant had initially denied involvement in a crime. *See Rumney*, 867 F.2d at 720 ("Nassoura's denials of involvement were made, predictably, before he was confronted with evidence linking him to the robbery. Once the police gathered enough information to arrest Nassoura, he changed his story. That the police chose not to include Nassoura's denials along with the

reason for his recantation is not material to a finding of probable cause.").

4. Motion to suppress email searches by Veloz (#370)

Veloz contends that the search of his email accounts hosted Apple and Google servers should be suppressed as "fruits of the poisonous tree." Because the argument is premised on the alleged illegal search of his laptop computer (from which the email addresses were taken), it fails with the denial of his motion to suppress that search.[19, 20]

---

[19] Where CW-2's information was authenticated by the evidence discovered at Veloz's residence pursuant to the original search warrant, it is of no consequence that subsequent warrant affidavits did not indicate that CW-2 may be bipolar, or may have committed other unrelated bad acts. *See Tanguay*, 2015 WL 2445764, at *5.

[20] An additional motion to suppress by Veloz (#210 and #226) is premised on a typographical error suggesting that searches of Veloz's home occurred on July 24, 2012 (the day before the warrant issued) and also on July 25, 2012. The parties do not dispute that the home was searched but once on July 25.

ORDER

For the foregoing reasons, the motions to suppress are <u>DENIED</u>.    The

Clerk will set the case for trial.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE