UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )    Cr. No. 12-10264-RGS
     v.                     )
                            )
4. DANNY VELOZ,             )
     Defendant.             )

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (*BRADY* MOTION)

For the reasons presented herein, the motion of the defendant, Danny Veloz (the "defendant" or Veloz"), to dismiss or for other appropriate remedies (Brady motion) should be summarily denied.  The government addresses the defendant's various arguments, *seriatim*, below.

### I.  SPOLIATION CLAIM

#### A.  The Legal Landscape

To prevail on a Due Process claim based on lost or destroyed evidence, the burden is on the defendant to show (1) either that the evidence possessed exculpatory value that was apparent before it was destroyed or that the government acted in bad faith in destroying the evidence, and (2) that the evidence was irreplaceable (i.e., that it is of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means").  See Magraw v. Roden, 743 F.3d 1, 8 (1st Cir.2014) ("[The controlling Supreme Court cases] frame a dichotomy between evidence that is apparently

exculpatory and evidence that is no more than potentially useful."); Olszewski, III v. Spencer, 466 F.3d 47, 55-58 (1st Cir.2006) (citations omitted).  The defendant cannot satisfy any of these three requirements.

In 2006, the First Circuit surveyed the legal landscape regarding the issue presented in this case.  The decision in that case -- Olszewski, III -- provides a clear and concise analysis of the governing law and demonstrates conclusively the inadequacy of the defendant's motion.  Subsequent cases have reiterated the validity of the rationale in Olszewski.  See, e.g., Magraw v. Roden, 743 F.3d 1, 8 (1st Cir.2014); United States v. Laurent, 607 F.3d 895, 900 (1st Cir.2010).  The salient points are summarized below.

The Supreme Court's decisions in Arizona v. Youngblood, 488 U.S. 51, 58 (1988), and California v. Trombetta, 467 U.S. 479, 488-489 (1984), "govern the constitutionality of the nondisclosure of evidence in 'cases in which the government no longer possesses the disputed evidence.'"  Olszewski, 466 F.3d at 55.  These cases and their progeny, as interpreted in Olszewski, demonstrate that a defendant seeking to dismiss allegations based on the alleged destruction of evidence bears a heavy burden.

The governing standard differs depending on the character of the evidence -- whether it is "apparently exculpatory" or

only "potentially useful." Id. at 56.  Thus, the threshold question is whether the defendant can show that it was apparent that the evidence was exculpatory before it was lost or destroyed.  Id. at 56-57 ("the Court [in Youngblood] emphasized that it must be apparent that the evidence is exculpatory before it is lost or destroyed").  If so, then the defendant need not show bad faith on the part of the government.  Id.

If the defendant cannot show that the evidence was "apparently exculpatory" -- i.e., if he can show only that the evidence is "potentially useful," then the defendant must show bad faith on the part of the government.  Id. (surveying cases and agreeing with the principle that "(1) the destruction of 'apparently exculpatory' evidence does not require a showing of bad faith but that (2) if the evidence is only 'potentially useful,' a bad-faith showing is required").  See id. at 57.  See also Magraw, 743 F.3d at 7-8 ("[The] state violates due process when it fails to preserve irreplaceable evidence possessing exculpatory value that is apparent before its destruction . . . [A] different rule obtains when the evidence is merely potentially useful to the defense. . . .  In that event, the defendant cannot prevail on his due process claim unless he establishes that the state acted in bad faith.")

In either case, the defendant must also show that the evidence is "to some extent irreplaceable."  Id. at 57 ("We

3

proceed nest to the question of whether the destroyed evidence satisfied Trombetta's requirement that it be 'to some extent irreplaceable.'") (quoting United States v. Femia, 9 F.3d 990, 994 (1st Cir.1993)).

**B.      Factual Background**

1.    The SIM Card

On July 23, 2012, a GPS device was located underneath Victim's 1 car (the "Acura") at 67 Allston Street, Lawrence, MA, when the police responded to a 911 call at that location. Trooper (now Sergeant) John Costa of the Massachusetts State Police ("MSP") Forensic Services Group photographed the Acura, and the GPS device attached to the Acura, while on location at 67 Allston Street, and then had the Acura towed to a nearby tow lot where he processed the Acura and the GPS device for fingerprints and DNA, and removed the GPS device.  Sergeant Costa photographed the GPS device in various stages as he disassembled it, and the SIM card that was inside the GPS device is included in those photographs.  See photographs attached as Exhibit A.

On August 13, 2012, DEA Special Agent Thaddeus Blazak conducted a data extraction from the SIM card and downloaded the data extraction onto a compact disc assigned as Exhibit N-71. See DEA report attached as part of Exhibit 2.  The data extraction revealed the unique SIM number associated with that

4

SIM card (89014103254753621667) (the "SIM Number").  Lori Ward,
Regional Sales Manager/Branch Manager, US Fleet Tracking, is
expected to testify that, during the manufacturing process, the
above unique SIM Number was married to the device number for the
GPS device in question (Device #7016657).  Based on the SIM
Number and the device number, US Fleet Tracking determined that
the GPS device recovered from underneath Victim's 1's car was
purchased from US Fleet Tracking on June 6, 2012.

On November 8, 2012, in response to a subpoena, US Fleet
Tracking gave the DEA access to the online account for Device
#7016657, as well as another device number associated with the
same US Fleet account (Device #7013719), so that the DEA could
view the tracking data and reports for the two devices.  On
November 15, 2012, DEA TFO Jason Sutherland downloaded on to a
compact disc, assigned Exhibit N-74, the data downloaded from
the US Fleet website for Device #7016657 (designated by the user
as "Car 1") and for Device #7013719 (designated by the user as
"Car 2") from July 20 to July 23, 2012.  See DEA reports
attached as part of Exhibit 2.  Among other things, with respect
to Device #7016657 (Car 1), that data shows a map image of
Lawrence from July 23, 2012, which tracks Victim 1's car to the
point and time where the kidnapping occurred at 67 Allston
Street (and later to the tow yard where the police brought the
car after the kidnapping).

The government anticipates showing at trial -- through,
*inter alia*, documents subpoenaed from US Fleet Tracking; the
testimony of Lori Ward, Regional Sales Manager/Branch Manager,
US Fleet Tracking; a data extraction and analysis of Veloz's
laptop; two telephone numbers, an email address, and two
physical addresses associated with Veloz; as well as the
testimony of five cooperating witnesses -- that the GPS device
recovered from underneath Victim 1's car was purchased by Veloz,
from the Veloz laptop, on June 6, 2012.[1]

---

[1] For example, the government anticipates that four
cooperating witnesses will testify that they were part of the
Veloz Crew that kidnapped Victim 1 and Victim 2 on July 23,
2012, and that, in the days leading up to that kidnapping, Veloz
showed them, on the large-screen television which was connected
to his laptop at his apartment, the live-feed of the Google map
image of Car 1 (i.e., the target's car) driving around various
parts of Massachusetts, as well as the image of Car 2.  The
government anticipates that a fifth cooperating witness will
testify that, when they were incarcerated together in 2011,
Veloz told him that he ran a kidnapping crew in Lawrence and
followed his targets by having GPS devices placed on the
underside of the targets' cars.

In addition, a US Fleet Tracking order form dated July 18,
2012, for a customer named "Juan Pablo Durarte", lists a phone
number of 978-876-2897.  Following his arrest on September 28,
2012, Veloz provided 978-876-2897 as his telephone number to
agents during the booking process.  Additionally, 978-876-2897
was listed under the name "Janny" in the contact list of CW-5's
cell phone.  CW-5 advised that this was a number for reaching
Danny Veloz through his girlfriend Jeanny Betances.  The device
ordered on July 18, 2012 was Device #7013719 and was assigned
"Car 2."  According to Lori Ward from US Fleet Tracking, the
user activated a Geo-fence for Car 2 in order to be notified
when the device entered into a certain area.  The user requested
that text alerts be sent to telephone number 617-412-6594.
Jeanny Betances, Veloz's girlfriend, provided the same number to

Royal Crest Motors when purchasing a gold Cadillac CTS with
Veloz on July 13, 2012.

The July 18, 2012 US Fleet Tracking order form lists
"palomo.1025@gmail.com" in the comments section.  An FBI
intelligence analyst found an image of the inbox of the
palomo.1025 account on the hard drive of one of the laptops
seized from Veloz's residence on July 25, 2012.  All but one of
the emails visible in the image of the inbox are from Brickhouse
Security.  The first few lines of text, which are also visible
in the image of the inbox, of two of the emails include "Dear
Juan Pablo Durarte."  Agents obtained a search warrant for the
palomo.1025@gmail.com account and found confirmation emails for
orders from Brickhouse Security and US Fleet Tracking, including
the orders for GPS devices on June 6, 2012 (Device #7016657/Car
1) and July 18, 2012 (Device #7013719/Car 2).

The order forms for the GPS devices purchased on June 6,
2012 and July 18, 2012 list a shipping address of 19 Tyler
Street, 2nd Floor, Lawrence, MA 01843. This is the address of
Jose Matos, a/k/a "Boyca."  Several cooperating witnesses have
identified Matos as Veloz's "boy", responsible for, among other
things, putting the GPS devices on target cars for Veloz.
Additional order forms for GPS devices associated with customer
name "Juan Pablo Durarte" or "Juan Pablo Duarte" list a shipping
address of 801 Saragota Street, 3rd Floor, East Boston, MA 02128
(this appears to be a typographical error and should be Saratoga
Street; there is no Saragota Street in East Boston).  RMV
records reflect that 801 Saratoga Street, Apt. 3, East Boston,
MA, was the address of Paula Martinez from May 2011 through
February 2013.  CW-5 identified a photograph of Paula Martinez
as one of Veloz's girlfriends.  When Veloz was arrested in
October 2010, he was with Martinez at her residence at the time.
Inmate visitor logs show that Martinez frequently visited Veloz
when he was housed at Essex County Correctional Facility from
October 2010 through March 2012.

The GPS devices ordered on June 6, 2012 and July 18, 2012
were purchased using a MasterCard credit card ending in 1648.
The 1648 MasterCard was issued by GreenDot (a bank which issues
pre-paid credit cards) to a customer identified as Ali Medina.
During the investigation, agents obtained from the MA Registry
of Motor Vehicles a fake driver's license registration in the
name of Ali Medina -- same date of birth, address, and social
security number as that maintained by GreenDot -- bearing a
photograph of Jose Matos, a/k/a "Boyca".  GreenDot customer
records showed that "Medina" provided a phone number of 978-620-

The GPS device was transferred at different points from the custody of the MSP, to DEA, to Lawrence PD, and to FBI.  At some point, the actual SIM card was lost.  As noted, however, on August 13, 2012, DEA SA Blazak extracted the data from the SIM card and downloaded it onto a compact disc assigned Exhibit N-71 (and the only significance of the SIM card itself is the SIM number, included in the extraction, which enables the government to tie it to the Device Number at US Fleet Tracking).

2.   The Pink Phone and Tablet

After the July 23, 2012, arrests at 890 Clay Street, Manchester, NH, the FBI executed a federal search warrant and seized, among other things, phones and computers, including a pink phone and a tablet.  Julie Maldonado (the wife of CW-2), who was not implicated in the kidnapping conspiracy, advised SA Orlando that the pink phone belonged to her and the tablet was used by her kids, and asked if she could keep them.  SA Orlando

---

6809.  One of Veloz's laptop computers listed an address book entry for "Boyca" (i.e., Matos) and listed the 6809 Number as "Boyca's" telephone number.  GreenDot also maintains a log of phone numbers used to access their telephone system.  On May 23, 2012, telephone number 978-876-2897 (i.e., the number provided by Veloz to agents at the time of his arrest on September 28, 2012) was logged by GreenDot as a number used to access the account.  The card was used for the first time the next day.

looked through the phone and tablet and confirmed that both appeared to be for the personal use of Mrs. Maldonado and her children. SA Orlando contacted AUSA Christopher Pohl and asked if he could return the pink phone and tablet to Mrs. Maldonado and AUSA Pohl said that he could. SA Orlando then returned the pink phone and tablet to Mrs. Maldonado.

**C. The Defendant Cannot Show that the Sim Card or the Electronics were "Apparently Exculpatory"**

The defendant cannot show, and does not even try to show, that the lost SIM card or returned electronic devices were exculpatory, much less "apparently exculpatory." The burden is on the defendant to identify an "exculpatory aspect" of these items, and it is insufficient to merely argue that a defense expert, given the opportunity to inspect the items, "might well have found evidence." Magraw, 743 F.3d at 8 (semen samples only potentially useful); Laurent, 607 F.3d at 900 (videotape of a drug transaction only potentially useful); Pratt v. Warden, N. N.H. Corr. Facility, 2006 WL 1425963, at *6 (D. N.H. May 23, 2006) (files on a seized computer only potentially useful). See also DiBenedetto v. Hall, 272 F.3d 1, 13 (1st Cir.2001) (blood stains on a sneaker were not "clearly exculpatory"); Femia, 9 F.3d at 995 (finding that the parts of audio tapes capturing conversations between the defendant and other alleged co-

conspirators "can only be characterized as potentially exculpatory evidence").

In this case, the defendant has not pointed to any exculpatory aspect of the returned electronic devices or the lost SIM card.  Regarding the returned electronic devices, the defendant simply states, in conclusory form, that the devices were seized "because of their use in facilitating kidnappings and communication between conspirators," and does not state any basis for this conclusion nor identify any reason to believe the devices would contain exculpatory evidence.  See Defendant's Motion at 1.

Regarding the SIM card, the defendant states, again in conclusory terms only, that the loss "[p]revents testing the accuracy of [the prosecutions] claims."  Id. at 2.  Lost items are not considered "apparently exculpatory" if "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  Magraw, 743 F.3d at 8 (internal quotations omitted).  In both cases, therefore, the defendant has failed to meet the burden of showing that the items were "apparently exculpatory."

**D.   The Defendant Cannot Show Bad Faith**

Since the evidence was not "apparently exculpatory," the defendant must show that the government destroyed the evidence in "bad faith".  See Youngblood, 488 U.S. at 58 ("unless a

10

criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"); Olszewski, 466 F.3d at 56 ("if the evidence is only 'potentially useful,' a bad-faith showing is required").  See also Magraw, 743 F.3d at 7-8; Laurent, 607 F.3d at 900.

The defendant cannot establish bad faith.  Indeed, the defendant does not even allege bad faith.  Instead, with regard to the returned electronics, the defendant merely states that the reason "the data on these devices was not preserved is unstated as is the reason for their return to the wife of a cooperating witness." Defendant's Motion at 1-2.  With regard to the lost SIM card, the defendant merely states that "[i]t is another piece of critical evidence in the hands of the prosecution that has been lost or destroyed."  Id. at 2.

The defendant's claim fails because the record is devoid of anything to suggest "official animus," or a "conscious effort to suppress exculpatory evidence."  See Trombetta, 467 U.S. at 488. See also United States v. Dumas, 207 F.3d 11, 15 (1st Cir.2000) (defendant making spoliation claim must show that, in failing to preserve the evidence, the government acted in bad faith); United States. v. Brimage, 115 F.3d 73, 76 (1st Cir.1997) (same); United States v. Marshall, 109 F.3d 94, 98 (1st Cir.1997) (same); United States v. Lewis, 40 F.3d 1325, 1340 (1st Cir.1994) ("the

dispositive factor is often whether the defendant can demonstrate that the government acted in bad faith"); United States v. Femia, 9 F.3d 990 (1st Cir.1993) (same).  See generally Arizona v. Youngblood, 488 U.S. 51, 58 (1988) ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").[2]

The Court need go no further.  The Court should summarily deny the defendant's spoliation claim because the defendant cannot show that the SIM card or the returned electronics were "apparently exculpatory," and cannot show that the government acted in bad faith.  In any event, the defendant also cannot show that the missing evidence was irreplaceable.

**E.    The Defendant Cannot Show that the Missing Evidence was Irreplaceable**

To prevail on a due process missing evidence claim, the defendant must show, not only that the evidence was "apparently exculpatory," or that the government acted in bad faith, but

---

[2] See also Youngblood 488 U.S. at 58 (finding that mere negligence on the government's part in failing to preserve evidence is inadequate to show bad faith); United States v. Parker, 72 F.3d 1444, 1452 (10th Cir.1995) ("Mere negligence is not sufficient to establish . . . bad faith."); United States v. Barton, 995 F.2d 931, 935 36 (9th Cir.1993) ("An officer does not act in bad faith unless he or she acts with the purpose of depriving the defendant of the potentially exculpatory evidence.").

also that the evidence is "irreplaceable." Olszewski, 466 F.3d at 58 ("Irreplaceability is part of the materiality requirement in destroyed evidence cases, and it follows that the defendant in such a case bears the burden of showing that the evidence was irreplaceable."). "The question of whether evidence is 'to some extent irreplaceable' is a legal question based on underlying facts." Id. at 58 (citing Trombetta, 467 U.S. at 489).

In Trombetta, the Court phrased the question as whether the defendants "were without alternate means of demonstrating their innocence." Id. (quoting Trombetta, 47 U.S. at 490). In that case, which involved the loss of breathalyzer test samples, the Court concluded that sufficient alternatives existed, including "(1) inspecting the breathalyzer machine, (2) raising an argument that radio waves or the diet of the defendant influenced the result, or (3) cross-examining the officer who administered the test." Id. (citing Trombetta, 47 U.S. at 490). See also DiBenedetto v. Hall, 272 F.3d 1,12 (1st Cir.2001) (no due process violation based on destruction of alleged blood spot on sneaker where "defendant remained free to impeach expert through questions about test methodology, inconsistent results, and, most importantly, about test's inability to conclude that spot was even human blood").

In this case, the defendant has numerous avenues to try to prove his innocence with respect to the kidnapping charges. For

example, the defendant can examine the data extracted from the SIM card prior to its loss and hire his own expert to challenge the accuracy of the government's assessment of the data.  The defendant can also cross-examine the U.S. Fleet Tracking representative that the government intends to call as a witness, and in doing so try to undermine the government's claim that the device on Victim One's car transmitted the data.  Cf. United States v. Patrick, 248 F.3d 11, 27 (1st Cir.2001) (defendant's due process rights were not violated since defendant had opportunity to cross-examine chemist and there was no reason to question chemist's results); Trombetta, 467 U.S. 479, 487 (the evidence "is not the breath itself, but rather the . . . results obtained from the breath samples").  The defendant can also cross-examine MSP Sergeant John Costa, who removed the GPS device from Victim One's car and photographed the GPS device and SIM card, and DEA Special Agent Thaddeus Blazak, who conducted the data extraction from the SIM card, as well as anyone else who handled the SIM card.  The defendant can similarly examine witnesses concerning the returned electronics.

        For these reasons, the defendant cannot show that the lost SIM card or the returned electronics in this case are irreplaceable.  Cf. United States v. Rivera Relle, 333 F.3d 914, 922 (9th Cir.2003) (rejecting spoliation claim based on erasure of tape where participants to conversation were available to

testify at trial); United States v. Jackman, 2003 WL 21754978,
*4 (3rd Cir. 2003) (rejecting defendant's claim that destruction
of evidence violated due process where defendant had other means
to show that missing item was not explosive device); United
States v. Newsome, 322 F.3d 328 (4th Cir.2003) (destruction of
items allegedly stolen from National Park did not violate due
process where defendant could cross-examine witnesses); Ford v.
Seabold, 841 F.2d 677, 692 93 (6th Cir.1988) (no due process
violation when serologist disposed of defendant's blood sample
and allowed another sample to deteriorate because, in addition
to serologist's good faith attempt to preserve samples and slim
possibility samples had exculpatory value, comparable evidence
was available by gathering data on mechanical failure of
Intoxylizer or by cross examining test administrator); Trevino
v. Dahm, 2 F.3d 829, 832 (8th Cir.1993) (no due process violation
in state's good faith failure to preserve blood sample for
independent testing because defendant had adequate opportunity
to impeach method of testing and qualifications of test
administrator).

This case does not come close to rising to the level of
serious constitutional violation pressed by the defendant. Cf.
Youngblood, 488 U.S. at 58 (limiting remedies based on
spoliation to those "class[es] of cases where the interests of
justice most clearly require it, i.e., those cases in which the

police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant"). The defendant's spoliation motion should therefore be summarily denied.

## II.  HENRY MALDONADO'S COMPUTERS

The defendant has not attempted to argue that anything on Maldonado's computers is <u>Brady</u> or even <u>Giglio</u>, and it's unclear that the government was required to disclose them in the first place. In any event, the defendant had the computers well in advance of the November trial date and, since the Court granted the defendant's motion to continue, and there is currently no trial date, the issue is moot.

## III.  DISCOVERY REGARDING HENRY MALDONADO

By letter dated October 1, 2015, the government provided the defendant with FBI interview reports in which Henry Maldonado said that he paid a correctional officer to bring Percocet pills and other items into the jail for him, and said that, on another occasion, Maldonado told another inmate that he had a connection for pills and they agreed to have the correctional officer smuggle them in some more pill, and have their respective girlfriends pay the correctional officer on the outside, but that the second deal never went down. By letter dated September 28, 2016, the government advised that Maldonado

said the second deal did occur and he and the other inmate split up the pills the officer brought in for them.[3]

The information about Maldonado is impeachment evidence, not Brady, which was disclosed to the defendant well before the November 2016 trial date, and obviously well before the now-unscheduled trial date.  Even if it were Brady, which it clearly isn't, there is no prejudice and no violation of any discovery obligation.  See United States v. Misla-Aldarondo, 478 F.3d 52, 64 (1st Cir.2007) (holding that no Brady violation occurred where the defendant knew of the impeachment evidence before trial and was not prejudiced by the delayed disclosure); United States v. Ingraldi, 793 F.2d 408, 411–12 (1st Cir.1986) ("When the issue is

---

[3] In connection with this affair, the correctional officer was prosecuted by the U.S. Attorney's Office in Rhode Island, pled guilty to one count of bribery, resigned from his position, and was sentenced to a three-year term of probation.  The true nature of the defendant's proposed witness list (58 witnesses listed) is revealed by the fact that the correctional officer (Scott Denton) is included on the witness list.  See FRE 608(b) (specific instances of the conduct of a witness, for the purpose attacking credibility, may not be provided by extrinsic evidence).  It was also revealed by the fact that, when Katie Turpin, one of the witnesses on the defendant's witness list, moved to quash the subpoena served on her, defense counsel did not even bother attending the hearing on the motion to quash, thus raising the question of whether the subpoena was served in good faith.  To date, the defendant has been unable to comply with the Touhy regulations for the federal law enforcement witnesses he subpoenaed.  The government anticipates that a majority of the defendant's subpoenas, which have been dutifully served by a Deputy United States Marshal, will likewise be quashed.

one of delayed disclosure . . . the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case."); United States v. Drougas, 748 F.2d 8, 23 (1st Cir.1984) ("[W]ith delayed disclosure, reversal will be granted only if defendants were denied the opportunity to use the disclosed material effectively."); United States v. Peters, 732 F.2d 1004, 1009 (1st Cir.1984) (holding that no Brady violation occurred where defendants "had two full days, including one nontrial day, in which to prepare" after the disclosure); United States v. Higgs, 713 F.2d 39, 44 (3rd Cir.1983) ("No denial of due process occurs if Brady material is disclosed to [defendants] in time for its effective use at trial"); United States v. McPartlin, 595 F.2d 1321, 1346 (7th Cir.1979) (holding that no Brady violation occurred where prosecutors waited until "early in trial" to disclose certain evidence because the disclosure was not "so late as to prevent the defendant from receiving a fair trial").

The information about Maldonado is garden-variety impeachment evidence, the likes of which is routinely disclosed in the weeks leading to trial. Moreover, the government has disclosed a plethora of Giglio-type information about Maldonado, including that he has a lengthy criminal record, which includes drug crimes and crimes of violence, that he engaged in numerous

18

uncharged crimes of violence and drug crimes that he disclosed during interviews, that he engaged in two kidnappings, that he burned the victim with a hot iron during one of the kidnappings, and that he lied for several years about the burning (blaming another cooperator) and about his involvement in the second kidnapping.

The First Circuit has consistently held that impeachment evidence is not considered "Brady material" when the defendant already has available other impeachment evidence on the same or similar topics.  See, e.g., United States v. Paladin, 748 F.3d 438, 447 (1st Cir.), cert. denied, 135 S. Ct. 694 (2014) (holding that "[a] prejudicial Brady violation has not been effected" where the government did not disclose evidence of a witness's continued drug dealing activities because "the defendant already had available to him evidence that would have allowed for impeachment on the same or similar topics"); United States v. Dumas, 207 F.3d 11, 16 (1st Cir.2000) ("Impeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral.") (quoting United States v. Sanchez, 917 F.2d 607, 618-19 (1st Cir.1990)).

Moreover, the First Circuit has specifically stated that evidence further undermining the credibility of a witness with an "extensive criminal history," like Maldonado, is not Brady material when the defendant already has evidence of the witness's numerous crimes.  See, e.g., United States v. Connolly, 504 F.3d 206, 217 (1st Cir.2007) ("Given [the witness's] extensive criminal history, it would not have been an abuse of discretion for the district court to find that the absence of additional cross-examination on essentially the same well-developed theme would not undermine confidence in the jury's verdict."); Moreno-Morales v. United States, 334 F.3d 140, 148 (1st Cir.2003) (failing to disclose additional polygraph results did not constitute a Brady violation because "the defense had numerous other examples of contradictory statements made by both witnesses" and "thus had ample evidence" for impeachment on that topic).[4]

---

[4] A Brady violation occurs only when the failure to disclose impeachment evidence leaves the defendant "without any similar material" and reasonably could have been "the difference between a conviction or acquittal." Conley v. United States, 415 F.3d 183, 190-91 (1st Cir.2005) (holding that a Brady violation occurred where the government failed to disclose evidence that a key witness, during an FBI interview, expressed uncertainty regarding the events in question and "request[ed] to be hypnotized in order to truly recall the events," and where the defendant had been "[w]ithout any other similar material" to impeach the witness's ability to recall and "suppression of the [evidence] may have made the difference between a conviction or acquittal") (internal quotations omitted).

## CONCLUSION

For the foregoing reasons, the defendant's motion should be summarily denied.

<div style="margin-left: 40%">

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:   s/ Peter K. Levitt
      Peter K. Levitt
      Christopher Pohl
      Assistant U.S. Attorneys

</div>

November 23, 2016

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 23, 2016.

<div style="margin-left: 40%">

s/ Peter K. Levitt
Peter K. Levitt
Assistant U.S. Attorney

</div>