UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
        v.                        )       Cr. No. 12-10264-RGS
                                  )
4.    DANNY VELOZ,                )
      a/k/a "Maestro,"            )
      Defendant                   )

## TRIAL BRIEF OF THE UNITED STATES

In accordance with the Court's pre-trial order, the government files this trial brief. Trial will commence on June 19, 2017. According to the Court's pre-trial order, each party has 20 hours for direct and cross-examination.

## I.    BACKGROUND

On September 27, 2012, a United States Grand Jury returned a superseding indictment charging Jose Guzman, a/k/a "Cano," Henry Maldonado, Thomas Wallace, Danny Veloz, a/k/a "Maestro," Gadiel Romero, a/k/a "T.C.," Luis Reynoso, and Jose Matos, a/k/a "Boyca" or "Voyca," with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c). On the same day, the Grand Jury returned an indictment charging Christopher Morales and Melvin Rivera, a/k/a "Chino," with being felons in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1). United States v. Morales et al., Cr. No. 12-10323-DJC.

Morales and Rivera subsequently pleaded guilty. Maldonado (CW-2), Wallace (CW-3), Guzman (CW-5), and Reynoso (CW-6)

(hereinafter, the "cooperating witnesses") all pleaded guilty pursuant to plea agreements containing standard cooperation provisions. Romero pleaded guilty without a plea agreement. Matos pleaded nolo contendere.[1]

II.   SUMMARY OF THE GOVERNMENT'S CASE

The Rescue. On July 24, 2012, at approximately 4:30 a.m., Detective Nicholas Georgoulis of the Manchester, New Hampshire Police Department responded to a radio call for a person screaming.[2] Detective Georgoulis found Manuel Amparo outside a home at 859 Clay Street in Manchester. Amparo was out of breath, frantic, wearing a ripped shirt, and was missing a shoe. Amparo told Detective Georgoulis that the day before, five kidnappers, armed with firearms, "dressed in black or dark blue shirts with the word 'POLICE' on them," pistol whipped him, abducted him and another man (later identified as Jose Daniel Felipe Castro) from Amparo's home in Lawrence, threw Amparo and Castro into a white Toyota minivan, and drove them to a nearby house, where they

---

[1]   Morales was sentenced to 180 months in prison as an Armed Career Criminal. Rivera was sentenced to 96 months in prison. Matos was sentenced to 144 months in prison.

[2]   The Court previously allowed the government's motion in limine to admit Amparo's statements to Detective Geogoulis as an excited utterance (Docket Nos. 595 and 743). In September 2016 Amparo was arrested in New York and charged with heroin trafficking. The government does not anticipate calling Amparo or the second victim, Jose Daniel Felipe Castro, as witnesses.

tortured Amparo with a hot iron.[3] Amparo identified the house where he was tortured - 890 Clay Street, a short distance away – and told Detective Georgoulis that the kidnappers and his friend (Castro) were still inside.

Manchester Police officers and FBI agents surrounded 890 Clay Street and stopped Maldonado and Wallace as they attempted to walk Castro out of the house. When officers cleared 890 Clay Street, they found Guzman hiding in an upstairs apartment.

The Cooperating Witnesses. The cooperating witnesses all advised agents that Veloz, a former karate instructor, was the leader of a Lawrence-based crew that kidnapped large-scale drug dealers for ransom (often referred to as Joloperros, Spanish for "stick-up men"). Veloz, a/k/a "Maestro," tracked the movements of drug dealers / prospective victims through GPS devices on their cars and used this data to plan kidnappings from a laptop computer hooked up to a large television at his home at 443 Andover Street, Apartment 9, Lawrence, Massachusetts. When ready, Veloz dispatched a kidnap team to subdue, abduct, transport, and restrain - even torture - the victim until the victim provided a ransom payment in drugs or money.

---

[3]    Detective Georgoulis observed a five-inch by three-inch burn on Amparo's lower right calf and right forearm and a two-inch by three-inch burn to his lower left calf. Along Amparo's waistline, Detective Georgoulis saw a burn that was "almost an entire imprint of an iron."

The government intends to focus on the July 23, 2012 kidnapping of Amparo and Castro. While different cooperating witnesses joined the conspiracy at different times and filled different roles, the government expects that the following evidence will be presented in its case in chief:

- Guzman met and became friendly with Veloz in 2010-2011 when they were in prison together at the Essex County Correctional Center at Middleton. While at Middleton, Veloz told Guzman that he tracked drug dealers using GPS devices on their cars and kidnapped them for ransom. Guzman also met other men who advised they did kidnappings with Veloz, including Romero and Morales;[4]

- On May 8-9, 2012, Guzman was on Saratoga Street in Lawrence to commit a Veloz Crew kidnapping with Morales, Rivera, Romero, Matos, and Juan Batista-Vallejo, a/k/a "Pancho" (an unindicted co-conspirator). Lawrence Police and FBI agents broke up the attempted kidnapping and arrested Morales and Rivera with firearms;[5]

---

[4]    Veloz was held at Middleton from October 23, 2010 to March 8, 2012. Guzman, Romero, Morales, and Rivera were all held at Middleton while Veloz was in custody there.

[5]    In a blue Plymouth Voyager registered to Jennifer Olmedo, Romero's girlfriend, agents found Guzman, Bautista-Vallejo, zip ties, and duct tape. Agents saw that the middle seat of the van was missing (several cooperating witnesses will testify that they used vans with the middle seat removed to make it easier to abduct victims). Another van (a green Dodge Caravan) parked nearby was empty but warm to the touch. Guzman will testify that Romero and Matos were in the second van and that they had walked away from the van shortly before agents arrived on Saratoga Street. In between the two vans was a gray Acura with tinted windows. Agents recovered loaded firearms from Rivera in the driver's seat and Morales in the front passenger seat. Detectives from the Lawrence Police Department interviewed Guzman and released him. On June 2, 2012, Guzman picked up Romero after he set his girlfriend's van on fire.

- After Morales and Rivera were arrested, Maldonado, Wallace, and Reynoso were recruited into the Veloz Crew. They watched Veloz track the GPS data of prospective victims from a laptop computer hooked up to a large screen TV in Veloz's living room and will testify that Veloz told them he was tracking drug dealers to kidnap;

- Guzman, Maldonado, Wallace, and Reynoso identified photographs of Veloz, identified him either by his true name or by the nickname "Maestro," identified photographs of the outside of Veloz's apartment building and identified photographs of the inside of Veloz's apartment, including the large screen TV where Veloz tracked the GPS data of drug dealers he targeted and a table where Veloz kept his karate trophies;

- Veloz, Guzman, Romero, Maldonado, and a friend of Maldonado's kidnapped a drug dealer on Whiting Street in Lynn on July 8, 2012. Maldonado and Guzman denied being on the Whiting Street kidnapping for years but will testify that they committed the kidnapping with Romero at the behest of Veloz. Guzman and Maldonado described how the crew, dressed in t-shirts with "police" on them, followed the victim, abducted him, and took him to Maldonado's home at 890 Clay Street. To secure his release, over a twenty-four hour span, the drug dealer arranged to have pills, cash, and several kilograms of cocaine delivered to the crew;

- Before the Whiting Street kidnapping, Guzman and Maldonado brought Wallace to Veloz's home to recruit him. There, Wallace learned how Veloz kidnapped drug dealers and watched Veloz track potential victims on the TV in his house. Wallace did not do the Whiting Street kidnapping but agreed to do the Amparo kidnapping in part because of news reports describing how the kidnappers, dressed in police shirts, abducted a Lynn man and escaped without a trace;

- In the weeks leading up to the Amparo and Castro kidnapping, Veloz told his crew that they were targeting a multi-kilo drug trafficker referred to at various times as "Gordo" or "Nene" (Amparo);

5

- The Veloz Crew attempted to kidnap Amparo on July 21, 2012. Guzman, Maldonado, Wallace, and Reynoso will testify that they picked up a kidnap bag from Matos at Matos's home, located at 17-19 Tyler Street, second floor, Lawrence (a short distance away from Veloz's house). The bag contained guns, police t-shirts, and zip ties. Over the phone, Veloz directed Guzman and the kidnap team to a club in Boston. The team saw Amparo's car (a maroon Acura SUV) at the club but decided the club was too public a location to commit the kidnapping;

- On July 23, 2012, Veloz kept the crew apprised of Amparo's location by communicating by phone with Guzman. The crew followed the same pattern set forth above – they picked up the kidnap bag from Matos and received updates on Amparo's location by phone from Veloz to Guzman. When Veloz told Guzman that the GPS data showed Amparo was near his home at 67 Allston Street in Lawrence, Guzman, Maldonado, Wallace, Reynoso, and Romero (armed and wearing t-shirts with the word "police" on them) abducted Amparo from the driveway of Amparo's home. They will testify that Castro was not an intended kidnapping target but was, in essence, at the wrong place at the wrong time;

- The kidnap team threw Amparo and Castro into a van with the middle seat removed and brought them to Maldonado's home at 890 Clay Street. Throughout the evening of July 23, 2012, Veloz and Guzman continued to speak by phone as Maldonado tortured Amparo with a hot iron and the crew tried to get Amparo to pay up. In his testimony before the Grand Jury, Guzman said, "Danny told me to put him on the phone" and Veloz told Amparo he "knew who he was and not to play games if he didn't want to die." As noted above, after he escaped, Amparo told Detective Georgoulis that while he was held captive one of his kidnappers handed him a phone and an unknown man (Veloz) told him that if he did not give them the money "they would kill him";

- Agents responded to Amparo's home and recovered a GPS device from the bottom of Amparo's maroon Acura and a zip tie from the driveway.

The Searches. On July 24, 2012 - after Amparo escaped,
Castro was recovered, and Maldonado, Wallace, and Guzman were
caught - agents executed a federal search warrant at Maldonado's
residence at 890 Clay Street. Among other items, agents seized
t-shirts with "police" on them, a loaded firearm, irons,
Amparo's wallet, and several cell phones. In a separate consent
search on July 26, 2012, agents recovered a sawed-off shotgun, a
mask, and a pair of handcuffs buried in the dirt floor of the
basement (Wallace will testify that he buried the items there).

On July 25, 2012, based on information initially provided
by Maldonado (later corroborated by the other cooperating
witnesses), agents executed a federal search warrant at Veloz's
residence at 443 Andover Street, Apartment 9, in Lawrence.
Agents seized several cellular telephones and two laptop
computers from Veloz's apartment. Agents also observed and
photographed a large flat screen TV mounted on the wall in
Veloz's living room, like the one the cooperating witnesses said
Veloz used to project GPS data of potential targets tracked from
his laptop computer.[6]

Phone Analysis. Guzman identified two phones seized from
Clay Street that belonged to him – a blue-black Samsung flip-
phone (978-394-8586, or the "8586 Number") and a black

---

[6]    The evidence seized from Clay Street and Andover Street
will be admitted through FBI Special Agent Sarah DeLair, who was
the FBI Evidence Response Team leader for both searches.

Blackberry (978-394-8492, or the "8492 Number"). Guzman's 8586 Number – in effect, his kidnapping "work" phone – was activated on July 10, 2012, two days after the Lynn kidnapping. Guzman's phone contained an entry in the contact list for every member of the July 23 kidnapping conspiracy, including for "Maetro" (Veloz's nickname spelled phonetically) with a number of 978-631-9784 (the "9784 Number").[7]

Agents subpoenaed phone records and identifying information for the 9784 Number (which was activated on July 9, 2012, one day after the Lynn Whiting Street kidnapping). The subpoena return from T-Mobile for the 9784 Number showed that it was a pre-paid phone with no subscriber information available with an International Mobile Subscriber Information (IMSI) number of 310260542041240. When agents searched Veloz's apartment on July 25, 2012, they seized several phones, including a phone with IMSI number 310260542041240 (i.e., the 9784 Number).[8] The contact list for Veloz's 9784 Number contained an entry for Guzman's 8586 Number under the name "Cub."

---

[7]    Aside from "Maetro" (i.e., Veloz), Guzman's 8586 Number contact list included numbers for: "H" (for "Henry," i.e. Maldonado), "Luis" (i.e., Reynoso), "Tc" (the nickname for Gadiel Romero), "Wboy" (meaning "white boy," for Wallace), and "V" (a number for Matos, a/k/a "Boyca" or "Voyka").

[8]    Two out-of-state analysts extracted data from these phones (see Expert Disclosure section, infra). The defendant declined to enter into a stipulation concerning the phone extraction reports from Clay Street and Andover Street.

Elisabeth Lenehan, an FBI analyst, determined that Guzman's 8586 Number and Veloz's 9784 Number were in regular contact on July 21, 2012 (when the Veloz kidnap team hunted Amparo at the Boston nightclub) and on July 23-24, 2012, before, during, and after the Amparo and Castro kidnapping. Between 5:30 p.m. on July 23, 2012 and 12:40 a.m. on July 24, 2012, Guzman's 8586 Number was in contact with Veloz's 9784 Number twenty times for a total of 38 minutes (Amparo and Castro were kidnapped from Allston Street at around 6:00 p.m.).[9] Several of Veloz's and Guzman's calls on July 23, 2012 lasted five to seven minutes and as noted above, during one call Guzman put Veloz on the phone with Amparo as he was being tortured.

Importantly, after agents recovered the victims on the morning of July 24, 2012, phone records show that Veloz's 9784 Number tried to call Reynoso, Romero, and Matos – i.e., the members of the conspiracy who were not arrested at Clay Street (Wallace drove Romero and Reynoso back to Lawrence after Amparo and Castro were secured inside 890 Clay Street and Matos was not at Clay Street that evening). The morning after the Amparo kidnapping, Veloz called Reynoso, met him at a Lawrence barber shop, and asked him if he had heard what had happened. Veloz

---

[9]     All told, on July 23-24, 2012, Guzman's 8586 Number and Veloz's 9784 Number were in contact 38 times for a total of one hour and two minutes. From July 10, 2012 to July 24, 2012, the two phones were in contact 209 times.

told Reynoso that Amparo had escaped and contacted the police, which led to the arrests of Maldonado, Wallace, and Guzman. Veloz told Reynoso to get a new cell phone and to be careful (Reynoso never saw or spoke to Veloz again).

Veloz at Booking. When Veloz was arrested on September 28, 2012, a DEA agent filled out a standard booking form (referred to in DEA parlance as a Form 202). When asked what his telephone number was, Veloz answered 978-876-2897 (the "2897 Number").[10]

The GPS Device. When agents responded to Amparo's residence at 67 Allston Street in Lawrence on July 23, 2012, they observed a GPS device attached to the bottom of Amparo's maroon Acura SUV. On August 13, 2012, DEA Special Agent Thaddeus Blazak downloaded data from a SIM card in the GPS device. Data extracted from the SIM card revealed that the SIM number associated with the device was 89014103254753621667. The data extracted from the SIM card was preserved but agents lost the actual SIM card.

Lori Ward, a Regional Sales Manager / Branch Manager, Texas Division, for U.S. Fleet Tracking will testify that during the company's manufacturing process the SIM number is matched to the serial number of the actual GPS device (i.e., they are assembled

---

[10]     The Court previously denied the defendant's motion to preclude the introduction of this phone number.

10

in the device together).[11] According to U.S. Fleet Tracking
records, SIM number 89014103254753621667 was matched to GPS
device number 7016657. Ward will identify a U.S. Fleet Tracking
video reproduction of an accelerated sequence of latitude and
longitude coordinates (referred to as a "vapor trail") from
device number 7016657 as it traveled to Boston on July 21, 2012
and to Amparo's residence at 67 Allston Street on July 23, 2012
at approximately 6:00 p.m. when he was kidnapped.

Using certified records and a return from a search warrant
of a Google e-mail account for Palomo.1025@gmail.com (discussed
below), agents determined the following:

- According to an order form from Brickhouse Security
  (Brickhouse was a dealer of U.S. Fleet Tracking
  products and services), GPS device 7016657 – a Live-
  Wire FastTrac 120-day GPS device – was ordered by
  Brickhouse from U.S. Fleet Tracking on June 6, 2012.
  Ward will explain that the order for 7016657 was a
  "drop ship," meaning that Brickhouse placed the order
  to U.S. Fleet and U.S. Fleet shipped directly to the
  purchaser and end user – in this case, an individual
  called "Juan Pablo Duarte," 19 Tyler Street, 2nd Floor,
  Lawrence, Massachusetts (the home of Jose Matos, a/k/a
  "Boyca"). U.S. Fleet delivered 7016657 via UPS to 19
  Tyler Street on June 8, 2012;[12]

---

[11]   A Subscriber Identity Module (SIM) card is a portable
memory chip. Ward will explain that the SIM card is the part of
the GPS device that relays GPS coordinates from the device to
computer servers at U.S. Fleet Tracking headquarters.

[12]   The cooperating witnesses will testify that Matos was, in
essence, Veloz's errand boy who did anything Veloz asked him to
do. The cooperating witnesses identified photographs of 17-19
Tyler Street, Lawrence, Massachusetts as "Boyca's" residence and
and advised that "Boyca" lived on the second floor on the left
hand side. On August 28, 2012, agents saw Matos and a female

- From a return of a search warrant for an e-mail account, agents recovered an e-mail from U.S. Fleet Tracking to Palomo.1025@gmail.com (discussed below) which stated that a Live-Wire FastTrac 120 Day GPS device had shipped to 19 Tyler Street on June 7, 2012 via UPS and would be delivered on June 8, 2012;

- Certified records from UPS confirm that UPS attempted to deliver the GPS device to 19 Tyler Street on June 8, 2012 at 9:22 a.m. (no one was present to sign) and that UPS actually delivered the GPS device to "Ertez" at 19 Tyler Street at 1:57 p.m. that day;

- Agents requested other customer records under the name "Juan Pablo Duarte." Brickhouse Security located an order form for a March 19, 2012 Live-Wire FastTrac 120 Day GPS Device and activation fee order shipped to Juan Pablo Duarte, 801 Saragota Street, 3rd Floor, East Boston Massachusetts 02128. (There is no Saragota Street in East Boston – there is an 801 Saratoga Street);

- Veloz was released from Middleton on March 8, 2012 (i.e., eleven days before this March 19, 2012 shipment to East Boston). One of Veloz's frequent visitors at Middleton was Paula Martinez. Certified records from the Registry of Motor Vehicles (RMV) showed that Martinez listed her home address in 2011-2012 as 801 Saratoga Street, East Boston, Massachusetts. Martinez's name and 801 Saratoga Street address was hand-written in a notebook of phone numbers recovered by agents during the search of Veloz's residence on July 25, 2012;

---

approach 17-19 Tyler Street. Using a ruse about recent break-ins in the area, agents requested identifying information from both individuals. Matos brought agents to the second floor apartment. Matos did not find any identification but provided agents with the name Jose Matos and a date of birth and social security number. Guzman will testify that he was with Veloz and Matos at Matos's residence on Tyler Street when Veloz told Matos to expect a GPS device to be delivered to Tyler Street.

- On May 1, 2012, Brickhouse Security received an order for a Live-Wire SIM card reactivation fee from "Juan Pablo Duarte" of 801 Saragota Street in East Boston;[13]

- On the June 6, 2012 Brickhouse Security order form, the Live-Wire FastTrac GPS device that ended up on the bottom of Amparo's car was ordered from a MasterCard credit card number ending in 1648. The 1648 MasterCard was issued by GreenDot (a bank that issues pre-paid credit cards) to a customer identified as Ali Medina. Agents located a Registry of Motor Vehicle (RMV) driver's license entry in the name of Ali Medina bearing a photograph of Jose Matos, a/k/a "Boyca," a/k/a "Voyka";[14]

- GreenDot maintains a log of phone numbers used to access their telephone system. According to certified records produced by GreenDot, on May 23, 2012, Veloz's 2897 Number was logged by GreenDot as a number used to activate the account. The credit card was used for the first time the next day;

- The June 6, 2012, Brickhouse order form listed a billing address (Juan Pablo Duarte, 19 Tyler Street, Second Floor, Lawrence), a shipping address (same), and an account address (Juan Pablo Durarte, 801 Saragota Street, 02128 (a zip code for East Boston, Massachusetts);

- On June 27, 2012, "Juan Pablo Duarte" (with the billing, shipping, and account address all listing "801 Saragota Street") ordered two "ten-second update" functions for GPS devices from Brickhouse using the GreenDot 1648 credit card;

- GreenDot records show that the 1648 card made purchases from Brickhouse Security on June 6, 2012, June 8, 2012, and June 28, 2012;[15]

---

[13]   The Lawrence-Saratoga Street attempted kidnapping occurred on May 8-9, 2012.

[14]   Guzman identified the RMV photograph of Ali Medina as "Voyca."

[15]   The Whiting Street kidnapping occurred on July 8, 2012.

- On July 18, 2012, U.S. Fleet Tracking records show
  that "Juan Pablo Durarte" of 19 Tyler Street, second
  floor, Lawrence, with a customer contact telephone
  number of the Veloz 2897 Number, using the GreenDot
  1648 card activated by Veloz's 2897 Number, with an
  associated e-mail account address of
  palomo.1025@gmail.com, purchased a PT-X5 Pro GPS
  device directly from U.S. Fleet Tracking;

- From the Palomo.1025@gmail.com search warrant e-mail
  return, agents recovered an e-mail from Lori Ward of
  U.S. Fleet Tracking dated July 18, 2012 advising "Juan
  Pablo – your order has been submitted for overnight
  shipping today." UPS records confirm that on July 19,
  2012, the GPS device was delivered to 19 Tyler Street
  at 9:16 a.m. (signed for by "Daurte").

<u>Computer Analysis</u>. Nikki Clemente, an FBI Intelligence
Analyst, will testify that the hard drive of one of Veloz's
computers contained an image of the U.S. Fleet Tracking logo, an
image of an icon used by U.S. Fleet Tracking to represent an
automobile, and an image of a Google G-Mail in-box of the e-mail
account Palomo.1025@gmail.com (the "Palomo Account"). The image
of the Palomo Account in-box included the first two or three
lines of text in the email from the sender. The emails in the
carved image are from Brickhouse Security or from Google.
Several of the emails include references to the name "Juan
Pablo" or "Juan Pablo Duarte." According to Clemente, the fact
that these images were recovered from the hard drive of a Veloz
laptop demonstrated that the user viewed the images and websites
from that computer.

In addition, Clemente catalogued internet activity from the Veloz computers. She observed numerous internet searches for and visits to sites dedicated to real-time GPS tracking devices (including the websites for U.S. Fleet Tracking, Brickhouse Security, and Lightning GPS); satellite and map images of areas pertinent to the kidnapping investigation; and internet searches related to kidnappings and co-conspirators. As early as June 21, 2012, one of the Veloz laptop computers searched Google Maps for 67 Allston Street in Lawrence, Amparo's home. One computer visited the U.S. Fleet Tracking web site on March 14, 2012 (Veloz was released from prison on March 8, 2012 and a GPS device was shipped to Martinez's address in East Boston on March 19, 2012). By April 2012 Veloz was actively navigating GPS tracking web sites. This type of activity continued until July 25, 2012, when agents seized the laptops at Veloz's residence.

The Veloz computers contained internet search histories for news related to the May 9, 2012 attempted kidnapping on Saratoga Street in Lawrence, the July 8, 2012 kidnapping on Whiting Street in Lynn, and the July 23, 2012 kidnapping of Amparo and Castro from 67 Allston Street in Lawrence. On July 8, 2012 (the day of the Lynn - Whiting Street kidnapping), one of the Veloz laptops checked the web sites for U.S. Fleet Tracking and Brickhouse Security and noted Google searches between 12:18 p.m. and 1:30 p.m. (when the kidnapping occurred) for "Tracking car

with gps," "tracking gps," "real time gps," and "real-time gps tracker device."[16] On July 9, 2012 (the day after the Whiting Street kidnapping), the analyst observed "cookies" (small text files that enable a web site to recognize and track the user's preferences) for various news outlets. These included "apnewsregistry" (a web site for the Associated Press), "Foxnews," "foxnewsinsider," and "myfoxboston" (local or national Fox news web sites), "NECN" (New England Cable News), "WHGH" (until recently, NBC's Boston-based affiliate), and "eagletribune" (the web site for the Lawrence Eagle Tribune). The analyst noted Google searches for "Eagle tribune lynn," "Lynn eagle tribune," "police investigation lynn eagle tribune," "necn lynn news," and "eagle tribune lynn police investigation kidnapping." Nearly all of the kidnapping-related information was recovered from a laptop which a user had named the "Veloz Family Laptop."

On July 24, 2012, after agents had recovered the victims and located Maldonado, Wallace, and Guzman at 890 Clay Street, one of the Veloz laptops ran internet searches for, inter alia, "Manchester SWAT," "Manchester Clay St," "Manchester Clay St SWAT," "Henry Maldonado," and an article in the Manchester Union

---

[16]    Maldonado advised that during the Whiting Street kidnapping, Veloz said the GPS data from the victim's car "froze." Romero said the same thing in his jail recording with Maldonado (discussed infra).

Leader entitled, "FBI says city standoff started with kidnapping."

The Maldonado-Romero Recorded Meeting. Before a United States Grand Jury, Maldonado identified photographs of members of the Veloz Crew, including Romero. After Romero was charged, Maldonado recanted his identification of Romero. Maldonado later explained to agents that he recanted his identification because Romero had threatened him in prison. Thereafter, the government obtained authorization to contact a represented party and agents recorded a conversation between Maldonado and Romero in prison.[17]

The recording is over an hour long and Romero and Maldonado frequently switch back and forth between English and Spanish. In addition to instructing Maldonado on how to recant his identification, Romero repeatedly referred to Veloz ("Danny,"), Guzman ("Cano"), Wallace ("Wallace" or "Wally"), Matos ("Voyca"), and Reynoso ("Luis"). Specifically:

- Romero complained to Maldonado that Veloz did not allow them to make enough money doing kidnappings: "I was out doing my own thing too. Do you remember one time when he says to me [unintelligible], 'Oh, how did you buy that car?' 'Not with you niggas. The most I ever see you with, motherfuckers, is five stacks, nigga.' I went with another team and I make 50 stacks in one night. One night, one hit. With Danny it is 5, 5, 5. No more, my nigga. It's like, you don't want us to get fat, you want us to, like, maintain and go";

---

[17]   The Court previously allowed the government's motion to admit Romero's non-testimonial statements against interest by a co-conspirator unavailable to testify at trial (Docket No. 564).

- Romero explained to Maldonado that after agents found Guzman in Romero's van on Saratoga Street, Guzman's phones were "tapped" (in context, downloaded). Romero then said, "Danny's phone wasn't tapped like that. You know that nigga was changing numbers";

- When Maldonado asked Romero, "So what did they catch Danny with at the end of the day?", Romero replied, "Nothing. Just the computer but the computer. They didn't have anything. They were, they checked on the hard drive and they, uh, like found certain things that had do with like . . . With the thing about chasing the car, but not saying like . . . Do you know the Lynn thing? They can't, they can't prove that shit because, do you remember that the GPS died? 'There is the car, there is the car' but the shit was dead. When this shit happened, the GPS wasn't on the Mass Pike, it was somewhere else. And they can't, you know what I mean?";

- Guzman and Maldonado will testify that Veloz and Romero used money from the Whiting Street kidnapping to purchase nearly identical Cadillac CTS automobiles. On the tape, Romero told Maldonado, "He wasted mad money in the car. Because I remember Danny had the same vehicle as mine. Same year and all, CTS. This shit didn't even have a sun roof." Later, Romero told Maldonado that he paid $7,000 for his CTS and that "Danny paid the same for his shit when that shit [Romero's car] was stocked, nigga" and "my shit had less mileage than his shit";

- When the kidnap team piled out of the van to kidnap Amparo, Romero said, "I was the first one that hit him, 'Be quiet,' and then [Wallace] hit him hard. Bang! Bang! Bang! Holy shit! . . . He [Wallace] cracked him. When I hit him with a shovel, he bled a little bit, but when that dude hit him with the grip of the shotgun, this nigga's blood was spurting everywhere. That poor Luis in the back, like this nigga. This is the third time I went to do something with Luis, my nigga. He did that shit three times in a row . . . He's not built for that, my nigga. He don't know none of that, he just wanted to get some money to help his girl, his little baby, man";

- Romero explained to Maldonado that the evidence in his case was weak: "Now, they already know from whom the guns come from . . . Because it's in the papers, it says that on such and such a day they went there to look for the bag, that it was Voyca who gave it to them, and that all the guns were inside there. Second: none of those guns that are there are going to come back with my fingerprints either, because remember I took mine with me";

- When Maldonado told Romero he had a good chance to beat his case, Romero replied, "And you know what I'm most afraid of, man? That the rest of the Joloperros in Lawrence, that all the niggas got snatched up. Carlos got snatched up . . . <u>Carlos, the guy with the glasses. The nigga that Danny kicked off the team</u>";[18]

- Romero told Maldonado that the victim was a multi-kilo drug dealer who would not come to court:

    - "They are going to need him to come to court to testify. Now, if the guy is intelligent and he knows what happened, he won't go to court . . . They were asking for a ransom for your head. They say they found a GPS under your car. So all that shit means is that you were doing something big, brother";

    - Romero told Maldonado he met Amparo's nephew in prison and told him, "Look, what I know is, your uncle can't go to court, I told him right there. Your uncle can't go to court. He will be arrested and they are going to give him fifty years or more, because they know he is a kilo carrier, 188 kilos were brought in . . . No he is going to be boiling, my nigga, they are going to put him in a pressure cooker and he'll be screwed."

## III. STIPULATIONS OF FACT

None at this time.

---

[18]   Several cooperating witnesses will identify a photograph of Carlos Bencosme, a/k/a "Carlito," as a member of the Veloz Crew who was kicked out the crew by Veloz. Bencosme is wearing glasses in the picture contained in the FBI Photo Book.

IV.  ANTICIPATED EVIDENTIARY ISSUES

Recording. As noted above, the government intends to introduce excerpts of Romero's consensually-recorded conversation with Maldonado. Federal Rule of Evidence 901(b)(5) permits sound recordings to be introduced through a witness who has "heard either firsthand or though mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." The government will introduce evidence that the recording is an accurate reproduction of the events involved from Maldonado, a participant in the conversation. The government will also offer testimony identifying the voices on each recording. A participant in the conversation (i.e., Maldonado) is competent to identify voices in a recording.

The recording is in both in Spanish and English and the government has provided defense counsel a draft transcript of the conversation in English. The government requests leave to read into evidence relevant excerpts and asks that the transcripts of the relevant excerpts be admitted into evidence. United States v. Rengifo, 789 F.2d 975, 983 (1st Cir.1986) (finding that English-language translations of tape-recorded conversations that originally took place in Spanish are admissible as substantive evidence; that such transcripts may go to the jury room; and that the government may use readers to

read the English translations as an alternative to playing the tape recording). These statements are offered as admissions of coconspirators pursuant to Fed. R. Evid. 801(d)(2)(E).

Charts Summarizing Voluminous Evidence. As noted above, the government intends to offer introduce summary exhibits of voluminous records pursuant to Fed. R. Evid. 1006.[19] Specifically, the government intends to offer summary charts concerning phone connectivity between Veloz and Guzman, charts summarizing the internet history of the Veloz laptops (discussed above), and charts summarizing the arrival and departure dates for Veloz and other co-conspirators from Middleton. Draft charts have been produced to defense counsel.

Expert testimony. In the absence of a stipulation, the government expects to call Intelligence Analyst Nikki Clemente and Forensic Computer Examiner Joseph Friesen to testify concerning the examination of the laptop computers seized from Veloz. Clemente used computer software programs to review and search items that had been imaged in this case, including the imaged copies of the two Veloz laptop computers. Clemente

---

[19]    According to Fed. R. Evid. 1006, "the contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation." See United States v. Capozzi, 2005 WL 1027373 (D. Mass. 2005) (defendant conceded that the call records were voluminous); Frasor v. Major League Soccer, L.L.C., 284 F.3d 47, 67 (1st Cir. 2002) ("It is hard to imagine an issue on which a trial judge has more discretion than as to whether summary exhibits will be helpful.").

reviewed internet histories from the Veloz laptop computers and searched the imaged hard drives of the Veloz computers.

Friesen is an expert in computer forensics and the management of digital evidence processing and information. Friesen was responsible for making a digital forensic copy of several devices seized in this investigation, including the laptop computers. He will testify about this process, referred to as imaging, and will describe how the data was extracted, analyzed, and preserved. He will describe his background, training and experience and his familiarity with computer forensic software, tools, and methods. Friesen will testify that the data extracted from a device provides a digital trail of activity that occurred on that device and a digital record of when it occurred.

In addition, in the absence of a stipulation (see footnote 8, supra), the government intends to call two out-of-state phone examiners. Greg Hermanson is a Computer Forensic Examiner assigned to the FBI's Computer Analysis Response Team (CART) in Quantico, Virginia. Dustin Simerly is an Electronics Engineer with the FBI's Cryptologic and Electronic Analysis Unit, also based in Quantico, Virginia. While they have various expert qualifications concerning the forensic analysis of digital media, in this case, both men performed similar tasks. Hermanson was able to use software to download the memory of cellular

telephones seized from Clay Street. The software programs create a report (often referred to as an "extraction report") that sorts and catalogues items on the phones, such as text messages, contact lists, call logs, etc. Simerly was able to use software programs to perform the same task on several of the items seized from Veloz's residence. For some phones, Simerly had to solder wires to the phones to connect them to a program that imaged their memory. The imaged copies could then be searched by software programs that creates a report of the items on the phones (like the phones from Clay Street and Saratoga Street).[20]

The government has been advised that Veloz intends to argue that the FBI, in effect, planted incriminatory evidence about him on the phones and computers seized in this case. Absent a good-faith showing by defense counsel, supported by record evidence of a qualified examiner – something that as of this writing the defendant has not produced to the government (in a

---

[20]     Under Fed. R. Evid. 702, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified to appear as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise" as long as the information is reliable. Courts considering such evidence have consistently "emphasized the fact that expert testimony is admissible where the inference that are sought to be drawn are inferences that a jury could not draw on its own" or even where "the subject looks like one the jury understands from every day life, but in fact, the inference the jury might draw are erroneous." United States v. Hines, 55 F. Supp.2d 62, 64 (D. Mass. 1999).

2012 case) – the Court should preclude defense counsel from making any such suggestion.

_Authentication of Business Records._ The government intends to authenticate business records pursuant to Fed. R. Evid. 902(11) by a written declaration of a qualified person. Records to be authenticated in this fashion include, inter alia, telephone records, records from U.S. Fleet Tracking and Brickhouse Security, financial records from GreenDot bank, and records from UPS.

V.   PRE-TRIAL MOTIONS

The Court previously allowed the government's motions to admit Amparo's excited utterances to Detective Georgoulis and to admit Romero's consensually recorded statement in prison to Maldonado concerning Veloz. The Court previously denied the defendant's motion to preclude the government from introducing the fact that Veloz gave the 2897 Number at booking.

VI.  VOIR DIRE

The government filed its proposed voir dire questions pursuant to the Court's pre-trial order.

VII. PROPOSED JURY INSTRUCTIONS

The government filed its proposed jury instructions pursuant to the Court's pre-trial order. In large measure, the government's instructions mirror standard First Circuit pattern instructions.

VIII.     SPECIAL ARRANGEMENTS

   Paralegal. In addition to trial counsel, the government requests that the Court allow Hannah Beller, a paralegal from the U.S. Attorney's Office, to sit at counsel table.

   Witnesses. Depending on the actual progress of the trial, the government may request that certain out of state witnesses be allowed to testify out of order. In particular, the government anticipates the need to call Lori Ward and the out-of-state phone examiners from Quantico out of order.

   Exhibits. The government will consult with court personnel to ensure that the format of its discs will be compatible with the courtroom's facilities. The government also anticipates that it may refer to certain charts or photographs (which will require the use of an easel) during its opening statement.  The government will address those issues with defense counsel and the Court prior to trial.

                          Respectfully submitted,

                          WILLIAM D. WEINREB
                          Acting United States Attorney

                     By:  /s/ Christopher Pohl
                          Christopher Pohl
                          Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 11, 2017.

/s/ Christopher Pohl
Christopher Pohl
Assistant U.S. Attorney