UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

vs.                                                      Docket No. 12-cr-10264-RGS

DANNY VELOZ

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Danny Veloz submits this memorandum tin support of his request for a sentence of 288 months (24 years) and 3 years of supervised release.

**EIGHTH AMENDMENT**

A life sentence is grossly disproportionate to Veloz's offense and violates the Eighth Amendment's prohibition on cruel and unusual punishment. "The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" *Ewing v. California*, 538 U.S. 11, 20, (2003) (plurality opinion) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 996-997 (1991) (Kennedy, J., concurring in part and concurring in judgment)).

The law is clear that if a sentence is "grossly disproportionate to the underlying offense," it offends the Eighth Amendment and "comprises cruel and unusual punishment." *Ewing v. California*, 538 U.S. 11, 23, (2003) (plurality opinion); *accord, United States v. Lyons*, 740 F.3d 702, 731 (1st Cir. 2014), *United States v. Raymond*, 697 F.3d 32, 40 (1st Cir. 2012), *United States v. Polk*, 546 F.3d

1

74,76 (1st Cir. 2008). The concept of proportionality is central to the Eighth Amendment and any judicial analysis of an Eighth Amendment claim. *Graham v. Florida*, 560 U.S. 48, 59 (2010). "Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Id.*, *quoting Weems v. United States*, 217 U.S. 349, 367 (1910).

The Supreme Court has set forth the objective factors courts should consider when sentences are challenged on Eighth Amendment grounds: (1) the gravity of the offense and the harshness of the penalty, (2) the sentences imposed on other criminals in the same jurisdiction, (3) the sentences imposed for commission of the same crime in other jurisdictions. *Solem v. Helm,* 463 U.S. 277, 291 (1983). This three-step analysis assesses both proportionality and the legislature's judgment in determining the punishment. "In performing this three-part test, courts must look at the actual severity of a defendant's offenses (as opposed to merely looking at the laws he violated), as well as look at the actual severity of the penalty (rather than merely at the name of the penalty); and courts must give recidivism great weight when assessing the gravity of an offense, and thus when justifying a harsh sentence." *United States v. Rivera-Ruperto*, 852 F.3d 1, (1st Cir. 2017) (Torruella, J., dissenting) (pet. reh'g filed Apr.10, 2017).

The PSR calculation of a life sentence under the guidelines, for the offense of conspiracy to commit kidnapping, is clearly a disproportionate penalty for the offense, especially when one considers Veloz's actual offense, and not just the law

he violated.  Veloz did not participate in the actual kidnapping, but was involved in the planning.  He did not target a vulnerable victim.  As discussed below, there were no serious or life-threatening injuries, and no one died.  Life sentences in the federal criminal system are extremely rare, with only 2.5% of people in the Bureau of Prisons serving a life sentence.  According to a report written by the United States Sentencing Commission, in virtually all life sentence cases in fiscal year 2013, one or more persons died as a result of the offense committed.  U.S. Sent. Comm'n, *Life Sentences in the Federal System* (2015) (attached as Ex. A).  Veloz has met the first step of the three-step analysis.

Veloz also has no trouble passing the second step, a comparison of the defendant's sentence with the sentences received by other offenders in the federal criminal system.  *Graham*, 560 U.S. at 60.  A review of Sentencing Commission statistics for defendants sentenced for a the primary offense of kidnapping / hostage taking shows the following:

| Fiscal Year | Mean Sentence | Median Sentence |
|---|---|---|
| 2015 | 235 months | 240 months |
| 2016 | 239 months | 213 months |
| 2017 (preliminary) | 230 months | 216 months |

Thus, a sentence of life imprisonment is far outside the average sentence for the same offense for the last three fiscal years.

In terms of specific cases within this district, defendant notes the following results in kidnapping cases:

3

08-cr-10346-MLW
Conviction: kidnapping and conspiracy to commit murder for hire
Defendant: Nicholas Djokich
Jury trial
Sentence: 240 months for kidnapping, 120 months for conspiracy to commit murder, to run concurrently.

12-cr-10120-NMG
Conviction: conspiracy to commit kidnapping

Defendant: Alfred Vazquez
Guilty plea
Sentence: 168 months

Defendant: Edgar Acevedo,
Guilty plea on eve of trial
Sentence: 192 months

Defendant: Miguel Nolasco
Guilty plea
Sentence: 140 months

Defendant: Julio Gonzalez
Guilty plea
Sentence: 192 months

Defendant: Deborah Torres
Guilty plea
Sentence: 72 months

Defendant: William Ayala
Guilty plea
Sentence: 90 months


12-cr-10214-GAO
Conviction: attempted arson, attempted kidnapping (2 counts)
Defendant: Benjamin Parker,
Guilty plea
Sentence: 72 months on each count, to run concurrently

14-cr-10075-DJC
Convictions: conspiracy, assault on a federal employee, robbery of a postal worker, kidnapping, attempted kidnapping, and use of a firearm in connection with a crime

4

of violence
Defendant: Keyon Taylor
Jury trial
Sentence: 60 months on Count 1, 235 months on Counts 2-5, all to run concurrently. 120 months on the 924(c) conviction to run consecutively, as required by statute

Another means of assessing the proportionality of a sentence is "[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem*, 463 U.S. at 291. *See United States v. Angelos*, 345 F. Supp. 2d 1227, 1244-1245 (D. Utah 2004), aff'd 433 F.3d 738 (10th Cir. 2006) (compiling cases).

A review of the same Sentencing Commission data shows the following regarding defendants sentenced for murder:

| Fiscal Year | Mean Sentence | Median Sentence |
|---|---|---|
| 2015 | 287 months | 300 months |
| 2016 | 241 months | 210 months |
| 2017 (preliminary) | 235 months | 178 months |

The only other crimes where average sentences are in the triple-digits are sexual abuse:

| Fiscal Year | Mean Sentence | Median Sentence |
|---|---|---|
| 2015 | 127 months | 120 months |
| 2016 | 144 months | 120 months |
| 2017 (preliminary) | 134 months | 120 months |

and child pornography:

| Fiscal Year | Mean Sentence | Median Sentence |
|---|---|---|
| 2015 | 153 months | 96 months |
| 2016 | 145 months | 97 months |
| 2017 (preliminary) | 143 months | 96 month |

As to specific cases within this district, defendant notes the following:

13-cr-10077-DJC
Conviction: tampering with a witness by attempting to kill, and false statements to a federal agent
Defendant: Jaquan Casanova
Jury trial
Sentence: 366 months on Count 1, 60 months on Count 2, to run concurrently.

15-cr-10338-FDS
Conviction: RICO conspiracy with racketeering acts of murder, attempted murder and robbery
Defendant: Hector Ramires
Guilty Plea
Plea agreement: 324 months (defendant scheduled for sentencing on January 19, 2018).

The third step involves a comparison of the defendant's sentence with sentences imposed for commission of the same crime in other jurisdictions. *Solem,* 463 U.S. at 291. A comparison of penalties for kidnapping in state courts also shows that a life sentence is far longer than what would be received in various states. For example, in Massachusetts, the punishment for kidnapping while armed with a firearm is not less than ten years in state prison. M.G.L. ch. 265, § 26. The statute calls for a state prison sentence of not less than 25 years if the offense is committed while armed with a dangerous weapon and serious bodily injury[1] is inflicted or the victim is sexually assaulted. In New Hampshire, Class A kidnapping is punishable by a minimum sentence of 7.5 years, and a maximum of

---

[1] The term "'serious bodily injury" is defined as "bodily injury which results in a permanent disfigurement, protracted loss or impairment of a bodily function, limb or organ or substantial risk of death," *id*. and thus is akin to the "permanent or life-threatening bodily injury" defined in the federal guidelines. USSG § 1B1.1, comment. (n.1(J)).

15 years.  RSA 633:1.

For all these reasons, a sentence of life imprisonment in Veloz's case would constitute cruel and unusual punishment, and violate the Eighth Amendment.

## GUIDELINE SENTENCING RANGE

The Probation Office has determined that Mr. Veloz has a Total Offense Level ("TOL") of 43 and a Criminal History Category ("CHC") of IV.  (PSR ¶ 105, 112).  Defendant objects to the assessment of various offense level increases, and maintains that his TOL should be 34.  Additionally, while he does not dispute Probation's calculation of his CHC, he believes that CHC IV overstates the seriousness of his background, and a CHC of III is more appropriate.

### Specific Offense Characteristics

The PSR has found the Base Offense Level ("BOL") for the conviction of Conspiracy to Commit Kidnapping is 32, pursuant to USSG § 2A4.1(a).  Veloz does not dispute this finding.  However, the PSR has added a six-level increase "since a ransom demand was made," USSG § 2A4.1(b)(1), and a two-level increase because the "victim sustained serious bodily injury (burns, bruises, and ligature marks)," USSG § 2A4.1(b)(2)(B) (PSR ¶ 85).  Veloz disputes both of these increases.[2]

### Six-level increase for ransom demand

The Guidelines provide for a six-level enhancement "[i]f a ransom demand or

---

[2] The PSR has added a two-level increase because a dangerous weapon was used. USSG § 2A4.1(b)(3) (PSR ¶ 86).  Defendant does not dispute this enhancement.

7

a demand upon government was made." USSG § 2A4.1(b)(1).  The term "ransom" is not defined in the guidelines, and the commentary to USSG § 2A4.1 gives no insight into what conduct the Sentencing Commission intends § 2A4.1(b)(1) to punish.  However, several Circuit Courts have defined the term, finding that the enhancement may be applied "only if kidnappers' demands for 'money or other consideration' reach someone *other* than the captured person." *United States v. Reynolds*, 714 F.3d 1039, 1044 (7th Cir. 2013) (emphasis in original).  *See also United States v. Sierra-Velasquez*, 310 F.3d 1217, 1221 (9th Cir. 2002) ("the ransom enhancement applies anytime a defendant demands money *from a third party* for a release of the victim….") (emphasis added); *United States v. Fernandez*, 770 F.3d 340, 343 (5th Cir. 2014) (adopting *Sierra-Velasquez* definition).

In coming to this conclusion, the *Reynolds* Court thoughtfully analyzed the language of the guideline, and noted that the guideline was the only one that applied to the Hostage Taking Act ("HTA"), 18 U.S.C. § 1203, which requires a ransom be made to a third party or the government.  The Court also noted that the "substantial" ransom enhancement, which calls for a six-level increase in the offense level,

> is warranted when demands reach third parties because those who are contacted will experience great stress and may attempt a rescue, escalating the threat of violence. Moreover, kidnapping someone in order to compel *others* to act, as a substitute for confronting or attempting to rob those others in person, can be a very effective way to accomplish crime that merits heightened deterrence. But when a kidnapping is conducted without the knowledge of anyone except for the victim, the scope of the crime and risk of harm to others, while undoubtedly extensive, is nonetheless not as great. *Cf. United States v. Alvarez-Cuevas*, 415 F.3d 121, 126-27 (1st Cir. 2005) (construing §

> 2A4.1(b)(6) to apply only to situations involving third parties even though the section makes no explicit reference to them, because of additional harm implicated in such situations).

*Reynolds*, 714 F.3d at 1044-1045 (emphasis in original).

In the case at bar, there was no testimony that any ransom demand was made to a third party. Moreover, the analyses done of the relevant phones, including extraction reports and phone company records of calls, does not disclose that any calls were made to third parties that could be persons to whom a ransom demand was directed. For example, there was no call to Amparo's wife, to anyone in New York City,[3] or to the Dominican Republic.

The defendant urges this Court to adopt the holding that the ransom demand under § 2A4.1(b)(1) requires that a demand be made to a third party, and reject the PSR recommendation of a six-level increase under USSG 2A4.a(b)(1).

**Two-level increase for serious bodily injury**

A defendant convicted of kidnapping can receive a two-level enhancement "if the victim sustained serious bodily injury" while detained. USSG § 2A4.1(b)(2)(B). The Guidelines define "serious bodily injury" as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." USSG § 1B1.1, comment. (n.1(L)). This can be

---

[3] Amparo is currently incarcerated in the Bronx on drug charges. Bronx Supreme Court case no. 02933-2016.

9

contrasted to "bodily injury," which the commentary to the Guidelines defines as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." USSG § 1B1.1, comment. (n.1(B)).

There is no provision made in the kidnapping guideline, USSG § 2A4.1, for an enhancement for an injury that only reaches the level of a "bodily injury." By contrast, other offense guidelines provide for enhancements for bodily injury, serious bodily injury, permanent or life-threatening bodily, or some degree between those types of injury. *See, e.g.*, USSC § 2B3.1, the guideline applicable to robbery, which provides for a two-level increase for bodily injury, a four-level increase for serious bodily injury, and a six-level increase for permanent or life-threatening bodily injury.

A review of cases where an enhancement for serious bodily injury was merited shows that the injuries suffered by Amparo do not rise to the level of serious bodily injury. In *United States v. Garza-Robles*, 627 F.3d 161, 165, 169-170 (5th Cir. 2010), the Fifth Circuit found that the victim, a drug trafficker who was kidnapped, taken to Mexico and brutalized by Mexican drug cartel members, had experienced pain sufficient to make application of the serious bodily injury enhancement plausible when the victim had been punched and kicked resulting in a broken rib, beaten with two-by-fours across his bare buttocks, sliced behind the ear with razors, wrapped in plastic wrap and beaten, had a gun shoved in his mouth, and had guns fired very close to his ears. The Sixth Circuit has found that

a defendant that repeatedly raped a victim, who was found lying in the fetal position and who required medical intervention in the form of a vaginal examination, could rightfully have been found to have caused serious bodily injury. *United States v. Tipton*, 11 F.3d 602, 610 (6th Cir. 1993). In *United States v. Thompson*, the Eighth Circuit found that a two-level enhancement for serious bodily injury was proper because, the "injury required both hospitalization, albeit briefly, and involved the impairment of his mental faculties when he was knocked unconscious." 60 F.3d 514, 518 (8th Cir. 1995). In *United States v. Bogan*, 267 F.3d 614, 624 (7th Cir. 2001), the Seventh Circuit found that an enhancement for serious bodily injury was merited when the victim "suffered lacerations requiring sutures, a fractured eye-socket bone, nerve damage to the left side of his face, ongoing emotional distress and migraine headaches, and the potential loss of three teeth."

By contrast, a review of cases involving offenses that allow for an enhancement for bodily injury show that this is more in line with Amparo's injuries (burns, bruises, and ligature marks). *See, e.g., United States v. Ledford*, 218 F.3d 684, 691 (7th Cir. 2000) (bodily injury where victim suffered "bruising on her side and arm" during robbery); *United States v. Hamm*, 13 F.3d 1126, 1128 (7th Cir. 1994) (finding bodily injury where victim "suffered bumps and bruises and had the wind knocked out of him as a result of being hit and knocked down" and "sustained a back injury requiring chiropractic treatment"). Because there is no enhancement under the kidnapping guideline for "bodily injury," the two-level enhancement for

11

serious bodily injury is not applicable to Veloz.

Furthermore, even if this Court were to find that Amparo sustained serious bodily injury, Veloz cannot be assessed the enhancement because he did not cause the injuries himself and he did not know that such injuries were being inflicted. *See United States v. Davis*, 19 F.3d 166, 171 (5th Cir. 1994).

### Multiple Count Adjustment

The PSR has increased the offense level by 1, finding that a "conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit," citing USSG § 1B1.2(d). (PSR ¶¶ 84, 99-101). Veloz should not be exposed to this one-level increase because there was no evidence that he conspired to kidnap Castro.

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict … does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

USSG § 1B1.2, comment. (n.4). The verdict was a general verdict, and did not establish which offense was the object of the conspiracy. (*See* Verdict Slip, ECF No. 1014). As noted in the Government's Trial Brief, "Castro was not an intended kidnapping target but was, in essence, at the wrong place at the wrong time." (ECF No. 816 at 6). Moreover, there was no evidence that Veloz was present at the scene of the Amparo kidnapping, or that he knew Castro was kidnapped at the

12

time it occurred.

To prove conspiracy to commit kidnapping, the Government must establish: (1) the existence of an agreement between two or more people to pursue the offense of kidnapping; (2) the defendant knew of the agreement; and (3) the defendant voluntarily participated in the conspiracy. *See United States v. Montgomery*, 210 F.3d 446, 449 (5th Cir. 2000) (citation omitted); 18 U.S.C. § 1201(c). As regards to Castro, there was no agreement to kidnap him, and even if there was an agreement among the other co-conspirators, Veloz neither knew of the agreement nor participated in it. As such, there was insufficient evidence to convict Veloz of conspiring to kidnap Castro, and the Court should sentence him based on the real offense, not the charged offense. *See* USSG Ch. 1, Pt. A, intro. comment (n.4(a), p.s.).[4]

**Role in the Offense Adjustment**

Section 3B1.1(a) of the Sentencing Guidelines calls for a four-level increase to the base offense level a crime involves "five or more participants or was

---

[4] The Sentencing Commission notes in the Policy Statement that one of the most important questions it faced in crafting the Guidelines was "whether to base sentences upon the actual conduct in which the defendant engaged regardless of the charges for which he was indicted or convicted ('real offense' sentencing), or upon the conduct that constitutes the elements of the offense for which the defendant was charged and of which he was convicted ('charge offense' sentencing)." USSG Ch. 1, Pt. A, intro. comment (n.4(a), p.s.). The commentary goes on to note that the commission sought to create a real offense system, but practical limitations caused them to move closer to a charge offense system. Nevertheless, using "real offense elements" the Commission was able to provide some flexibility from the charged offense to reflect the actual conduct.

otherwise extensive," and the defendant was an "organizer or leader." The PSR has determined that this adjustment applies to Veloz. PSR ¶ 89. The jury believed that Veloz was somehow involved in the Amparo kidnapping conspiracy. However, there was not sufficient credible evidence to prove that Veloz was the leader, or that he had a sufficient degree of discretion and planning, or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy. The Government has not provided credible evidence that Veloz was any more culpable than his co-defendants.

**A Criminal History Category of IV Overstates the**
**Seriousness of Veloz's Background**

A CHC of IV, with 7 criminal history points, exaggerates the true seriousness of Veloz's background. Recognizing the inadequacies of the criminal history scoring system, the Sentencing Commission encourages departures where "reliable information" indicates that the criminal history category "significantly over-represents the defendant's criminal record or the likelihood that the defendant will commit further crimes." *See, e.g.* United States v. Lindia, 82 F.3d 1154, 1164-65 (1st Cir. 1996); *States v. Mayes*, 332 F.3d 34 (1st Cir. 2003); *United States v. Shoupe*, 35 F.3d 835, 837 (3rd Cir. 1994).

U.S.S.G. § 4A1.3 provides sentencing courts with the flexibility to adjust a defendant's criminal history category or offense level if reliable information indicates that the defendant's criminal history category or offense level misrepresents the seriousness of the defendant's past criminal conduct or the

14

likelihood of a defendant's recidivism.  As such, § 4A1.3 departures permit a court to put the defendant's record in the context of his life and background.  *United States v. Wilkerson*, 183 F. Supp. 2d 373, 380 (D. Mass. 2002).  Pursuant to § 4A1.3, "Every defendant is different and must be considered as an individual."  *United States v. Hammond*, 240 F. Supp. 2d 872, 877 (E.D. Wis. 2003).

There are a number of factors courts have used in determining whether a departure pursuant to § 4A1.3 is warranted:  the likelihood of recidivism, comparison of other similar category offenders, the nature of this offender relative to other information available to the court, the age of the prior offenses as well as of the defendant at the time the prior offenses were committed, drug and alcohol abuse, the circumstances of the prior offenses, the length of prior sentences, the circumstances of the defendant's life at the time the prior offenses were committed.  *See Hammond*, 240 F.Supp.2d at 877-80; *see also United States v. Leviner*, 31 F.Supp.2d 23, 32 (D. Mass. 1998).

In the case at bar, Veloz has two prior convictions, both for relatively minor crimes, for a total of 5 criminal history points.  Specifically, he was convicted of possessing a firearm without a license, and discharging a firearm within 500 feet of a building (Lawrence Dist. Ct. No. 0018CR0191) for which he received an 18-month sentence, and wanton destruction of property (Lawrence Dist. Ct. No. 0318CR1319) for which he received a 60-day sentence.  (PSR ¶¶ 108-109).  Veloz received an additional 2 criminal history points because the instant case occurred while he was on probation for the gun case.  A CHC of IV significantly misrepresents the

15

likelihood of his recidivism after Veloz serves his sentence in the present case. A CHC of III would be more appropriate in this case, and defendant requests a downward departure under U.S.S.G. § 4A1.3.

**Acceptance of Responsibility**

> I've lived with mendacity! —Why can't you live with it? Hell, you got to live with it, there's nothing else to live with except mendacity, is there?

Big Daddy to son Brick in Tennessee Williams' *Cat on a Hot Tin Roof*

It is inexplicable to all why Brick, a former football star with a TV announcing career, a smart beautiful wife and a massive future inheritance, is vigorously engaged in destroying himself with alcohol. Brick says he drinks out of "disgust," and because of "mendacity." This elicits the above response from Big Daddy. Danny Veloz's act of going to trial in a system that convicts at rates around 97% seems as similarly inexplicable as Brick's choice of self-destruction. The thing the unites Veloz and Brick is an incapacity, not to accept responsibility, but rather to accept mendacity.

To read that his co-defendants had accused him of things that, with any effort by law enforcement or the prosecution, could have been shown to be demonstrably false, and to watch them go not only unchallenged but accepted, led him to say, "I want my day in court. I want to challenge the mendacity." This is something the judicial system should encourage, not punish.

In its closing argument at trial, the Government acknowledged the dishonesty of many of its witnesses. Any fair reading of the evidence and the

testimony shows the Government's case was riddled with lies. The fact that the jury convicted Mr. Veloz does not mean they believed the witnesses.

In this case, a trial was necessary to elucidate the lies being told by the Government's witnesses. Veloz watched as bald-faced untruths not only went unchallenged, but in fact were presented to a grand jury as the truth. The defense unmasked the lies of the cooperators using discovery provided by the Government. The fact that the witnesses were not credible was fully disclosed only after their testimony. By going to trial, Mr. Veloz revealed the questions the prosecutors never asked their cooperators, and showed how inconsistencies were never investigated. For example, Jose Guzman testified that the phones seized from him at Saratoga Street would show contacts with Veloz. He acknowledged that if the records did not show those contacts then he was perjuring himself, and that Veloz was not involved in the attempted kidnapping on Saratoga Street. In fact, as shown at trial, the phone records revealed no contacts with Veloz.

Contesting the factual elements of guilt at trial does not automatically foreclose the possibility of a reduction for acceptance of responsibility. The Guidelines Manual itself notes this and, though focusing on legal and constitutional instead of factual challenges, makes allowance for "rare situations" when a defendant can accept responsibility while exercising his right to a trial. USSG § 3E1.1, n.2. Moreover, in addition to going to trial to show the lies that the prosecution witnesses were telling, Veloz also went to trial for the purpose of asserting and preserving issues unrelated to factual guilt, including the

17

constitutionality of the search warrants. He should not be denied a reduction in offense level for acceptance of responsibility in this circumstances.

### A VARIANCE OUTSIDE THE GUIDELINE RANGE TO A SENTENCE OF 24 YEARS WOULD BEST SATISFY THE GOALS OF SECTION 3553(a)

The sentencing of a defendant (at least since *Booker*) is not a mechanical exercise based purely on objective criteria. Rather, these sentencing factors call for the use of subjective judgment, *i.e.*, the exercise of judicial discretion based on consideration of the human condition and the vagaries of human conduct. In essence, these factors express the "just desserts" concept of justice. As stated in the Senate Report that was part of the Sentencing Reform Act, "It is another way of saying that the sentence should reflect the gravity of the defendant's conduct." Sen. Rep. 98-225 at 75 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3258. The sentence should thus reflect both the public's interest in the harm done and the defendant's interest in avoiding an unreasonably harsh sentence under all the circumstances of the case. *Id.*

Defendant notes, however, that the deterrence and punishment goals of sentencing are only part of the equation, albeit that focused on by the prosecution. Incarceration has consequences that must be taken into consideration. These consequences, often only dimly foreseen at sentencing, have a tremendous impact, not only on the offender, but also on families, communities, and on the nation as a whole. Some of the consequences of a felony conviction are well known – longstanding restrictions on travel, firearms ownership, and voting – but many

additional restrictions have been enacted in laws passed since the beginning of the "get tough" movement in the 1980s. There have been hundreds of changes to state and federal law that impose additional penalties on felons, penalties that also impact families and the communities from which they come.

Even if this Court disagrees with defendant's arguments regarding the proper guidelines calculation, the facts of the case show that a variance outside the guideline range would best satisfy the goals of sentencing set out in 18 U.S.C. § 3553. Danny Veloz asserts that a sentence of 288 months and 3 years of supervised release, will provide deterrence, just punishment for his crime, yet also take into consideration the collateral consequences of imprisonment.

## CONCLUSION

For each and all of the foregoing reasons, a sentence of 288 months, no fine due to his present lack of resources, and 3 years of supervised release, is "sufficient, but not greater than necessary," to achieve the sentencing goals of 18 U.S.C. § 3553(a).  Taken together, the history and characteristics of the defendant, the nature and circumstances of the offense, the sentencing factors described in Section 3553, all support the disposition requested herein.


DANNY VELOZ
By his attorney

/s/ MARK W. SHEA                              Dated:  November 13, 2017
Mark W. Shea
929 Massachusetts Avenue, Suite 200
Cambridge MA  02139
617.577.8722
markwshea@gmail.com


**Certificate of Service**
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 13, 2017.

/s/ Mark W. Shea
MARK W. SHEA